**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KATHY K. PEOPLES and MICHAEL G. MOORE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

H. LEE MOFFITT CANCER CENTER AND RESEARCH INSTITUTE, INC.,

Defendant.

_______________________________________/

CASE NO. ______________

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Kathy K. Peoples and Michael G. Moore (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant H. Lee Moffitt Cancer Center and Research Institute, Inc. ("Moffitt" or "Defendant"), and allege as follows based on personal knowledge as to Plaintiffs' own acts and on information and belief as to all other matters:

## NATURE OF THE ACTION

1. This is a class action arising from Moffitt's collection and disclosure of website visitors' sensitive personal and health-related information and electronic communications to Google LLC ("Google"), Microsoft Corporation ("Microsoft"), X Corp. ("X" or "Twitter"), and Reddit, Inc. ("Reddit") (collectively, the "Third-Party Recipients"), without prior notice and consent, through tracking technologies embedded in Defendant's website, www.moffitt.org (the "Website"). Moffitt's conduct is directly contrary to the representation in its Internet Privacy Policy that any disclosure of user information to third parties is limited to non-identifiable, aggregate, or anonymized data.

2. H. Lee Moffitt Cancer Center and Research Institute is a Tampa, Florida–based, National Cancer Institute–designated Comprehensive Cancer Center and one of the largest cancer hospitals in the United States. Founded in 1986 and headquartered in Tampa, Florida, Moffitt operates a cancer hospital, clinics, and a multi-specialty oncology physician practice, and generates approximately $2.27 billion in annual revenue. Through the Website, Moffitt enables prospective and existing patients to request new-patient appointments, research cancer types and treatments, locate and select physicians, and communicate with the institution about their cancer care.

3. The Website functions as a cancer-care–seeking tool. In the appointment-request flow, a prospective patient supplies contact details—including an email address and telephone number—in order to schedule a new-patient appointment. In the "Find a Doctor" flow, users select a cancer type, provider type, location, gender, and language; enter free-text keywords describing the care they seek; and open the profile of a specific physician. In each instance, users disclose sensitive information about their own cancer-related conditions and care needs, or those of the individuals for whom they seek care.

4. Unbeknownst to Website visitors, Moffitt has knowingly implemented tracking tools operated by the Third-Party Recipients, including Google's advertising and analytics technology (operated by Google), the Microsoft/Bing Universal Event Tracking tag (operated by Microsoft), the X (Twitter) advertising pixel (operated by X), and the Reddit advertising pixel (operated by Reddit) (collectively, the "Trackers," and each individually, a "Tracker"). In the appointment-request flow, the contact details a prospective patient enters—email address and telephone number—are transmitted to Reddit and X as SHA-256 hashes that serve as cross-platform identity-match keys. In the Find a Doctor flow, the user's health-related search criteria (cancer type, provider type, and free-text keywords) and the specific physician viewed are

transmitted in plain text to Google, Microsoft (Bing), X, and Reddit alongside persistent advertising identifiers; and on the physician's page, Reddit re-attaches the same hashed email and telephone number observed in the appointment flow, linking the user's cancer-related browsing to the user's real-world contact identity.

5. What aggravates Moffitt's conduct is the timing and manner of these disclosures. Users are never asked to agree to any terms and conditions before they interact with the Website, and are never presented with a cookie banner, pop-up, checkbox, or any clickwrap agreement. Instead, the Website transmits users' appointment-request contact details and Find a Doctor search criteria, provider selections, and browsing activity to the Third-Party Recipients in real time as they occur. Moffitt's Internet Privacy Policy appears only as a small-print hyperlink in the Website footer—where users have no occasion to encounter it before their information has already been intercepted and transmitted—and represents that any disclosure of user information to third parties is limited to non-identifiable, aggregate, or anonymized data.

6. This interception of private electronic communications occurs without appropriate notice to visitors and without their consent, in violation of (1) the Florida Security of Communications Act, Fla. Stat. § 934.01, *et seq.* ("FSCA"), and (2) the federal Electronic Communications Privacy Act, 18 U.S.C. § 2511 *et seq.* ("ECPA").

7. Under the FSCA, it is unlawful to intentionally intercept, endeavor to intercept, or procure any other person to intercept any wire, oral, or electronic communication without the consent of all parties to the communication. Moffitt violated the FSCA by deliberately embedding tracking technologies on its Website that procured the Third-Party Recipients to intercept users' private electronic communications—including their appointment-request contact details and their

cancer-type, provider, and free-text search criteria and physician selections—in real time, without the knowledge or consent of any party to those communications.

8. Under the ECPA, similar protections exist at the federal level. Although the ECPA contains a one-party consent exception, that exception does not apply here because Moffitt procured the interceptions for the purpose of committing a criminal or tortious act—specifically, the unauthorized use and disclosure of individually identifiable health information for commercial advantage in violation of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6.

9. Independent of these statutory violations, Moffitt owed Plaintiffs and Class Members a duty of confidence and breached it. Users disclosed their cancer conditions, symptoms, care needs, treatment interests, provider preferences, and contact information to Moffitt in confidence, for the purpose of obtaining cancer information, treatment, and care from the cancer center they entrusted with that information. Moffitt accepted that trust and then disclosed that nonpublic information to the Third-Party Recipients—advertising and analytics companies with no role in furnishing users' care—without consent or privilege. A breach of confidence claim lies for an unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship.

10. Further, Moffitt solicited and obtained users' sensitive health-related and personal data and put that data to use for advertising, analytics, conversion-optimization, lead-generation, and new-patient-enrollment purposes, without ever compensating users for the value it received. Moffitt has thereby been unjustly enriched at Plaintiffs' and Class Members' expense.

11. Through this action, Plaintiffs seek to hold Moffitt accountable for these privacy violations, to obtain appropriate remedies for affected individuals, and to prevent the continued procurement of interception of electronic communications through Defendant's Website.

**PARTIES**

12. Plaintiff Kathy K. Peoples is an adult citizen and resident of the State of Florida, residing in Beverly Hills, Citrus County, Florida.

13. Plaintiff Michael G. Moore is an adult citizen and resident of the State of Florida, residing in Hernando, Citrus County, Florida.

14. Defendant H. Lee Moffitt Cancer Center and Research Institute, Inc. is a not-for-profit corporation organized and existing under the laws of the State of Florida, with its principal place of business at 12902 USF Magnolia Drive, Tampa, Florida 33612, located in Hillsborough County. Moffitt is a National Cancer Institute–designated Comprehensive Cancer Center and one of the largest cancer hospitals in the United States, generating approximately $2.27 billion in annual revenue. Moffitt develops, maintains, operates, and controls the Website, including the tracking technologies deployed on it.

**JURISDICTION AND VENUE**

15. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges claims arising under federal law, namely the ECPA, 18 U.S.C. § 2511, *et seq.*

16. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

17. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive

of interest and costs, there are more than 100 members in the proposed Class, and at least one member of the Class is a citizen of a state different from Defendant, which is a citizen of Florida.

18. This Court has personal jurisdiction over Defendant because Moffitt is a Florida corporation with its principal place of business in Tampa, Florida, within this District, and operates and controls the Website from Florida. The acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

19. Venue is proper in the Tampa Division of the Middle District of Florida under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant resides in this District and maintains its principal place of business at 12902 USF Magnolia Drive, Tampa, Florida, which is located in Hillsborough County within the Tampa Division. A substantial part of the events or omissions giving rise to the claims occurred in this District, because the tracking conduct at issue is deployed from Moffitt's centralized Website, which is operated, maintained, and controlled from this District, and the Website is accessible to and used by consumers throughout the District.

## FACTUAL ALLEGATIONS

### A. Overview of Website Tracking on Healthcare Websites

20. Many websites employ tracking technologies that collect personal data about users' online activities. These technologies have become ubiquitous across the internet, collecting vast amounts of data about user behavior, preferences, and interests. In the healthcare context, they are particularly concerning because they can capture sensitive medical information, including the types of care a user is researching, the providers a user is seeking, and the conditions a user or a user's loved one may be experiencing.

21. The interception of healthcare-related communications through these tracking technologies is especially problematic because it can reveal highly personal and sensitive medical

conditions, treatment interests, and care-seeking behaviors to third parties without patients' knowledge or explicit consent. That concern is heightened where, as here, the conduct being researched is cancer diagnosis and treatment.

22. As detailed below, Moffitt has implemented tracking technologies on its Website that result in the Third-Party Recipients' unauthorized interception of visitors' electronic communications.

**B. The Tracking Technologies Deployed on the Website**

23. Google is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms and generates most of its revenue through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its products and services, which it then leverages to deliver targeted advertisements. Moffitt has implemented Google's advertising and analytics technologies on its Website, which transmit user interactions to Google endpoints such as googleadservices.com and googleads.g.doubleclick.net. Those transmissions carry Google's persistent advertising identifier ("auid") and related identifiers, which Google can use to recognize and link activity associated with the same browser, device, or account across interactions and contexts. Where a user is signed into a Google account, Google may associate the transmitted activity with that authenticated account.

24. Microsoft is a multinational technology company headquartered in Redmond, Washington. Microsoft collects user data through services including its Bing search and advertising network (Microsoft Advertising) and its Universal Event Tracking ("UET") tag. Moffitt has implemented Microsoft's Bing UET tag on its Website. When a user interacts with a page carrying the tag, information about the user's actions is automatically transmitted to

Microsoft (via requests to endpoints such as bat.bing.com), together with the "MUID" (Microsoft User ID) cookie—a persistent, browser-level identifier that Microsoft uses to recognize and link activity associated with the same browser across interactions and websites using Microsoft tracking technologies.

25. X Corp. operates the social-media and advertising platform formerly known as Twitter, together with its advertising pixel and conversion-tracking technology. Moffitt has implemented the X (Twitter) advertising pixel on its Website, which transmits information about users' interactions to X (via requests to endpoints such as analytics.twitter.com and t.co), together with X's advertising identifiers and, in the appointment-request flow, the user's hashed email address ("email_address") and hashed telephone number ("phone_number").

26. Reddit, Inc. operates the social-media and advertising platform Reddit, together with its advertising pixel. Moffitt has implemented the Reddit advertising pixel on its Website, which transmits "PageVisit" and related events to Reddit endpoints (such as alb.reddit.com and pixel-config.reddit.com), together with Reddit's persistent advertising identifiers and the user's hashed email address ("auto_em") and hashed telephone number ("auto_pn").

27. Each of the Third-Party Recipients' privacy disclosures confirms that it uses the data it collects to advertise and market to users, including by targeting advertising and combining data collected from different contexts to build unified profiles.

### C. Moffitt Shares Users' Private Health Information with Third Parties

28. Through the Website, users perform a range of activities, including requesting new-patient appointments; researching cancer types, treatments, services, and providers; running the Find a Doctor search; and opening the profiles of specific physicians. In doing so, users communicate private and personal information via the Website, including protected health

information ("PHI"). Unbeknownst to the Website's users, Moffitt surreptitiously shares this private and protected information with the Third-Party Recipients, without users' consent.

29. Specifically, and as documented in the figures below, Moffitt shares with the Third-Party Recipients, without users' knowledge or consent, the following categories of user communications: (i) the email address and telephone number a user enters into the "Request a New Patient Appointment" form; (ii) the user's Find a Doctor search criteria, including cancer type, provider type, location, gender, language, and free-text keywords; (iii) the specific physician whose profile the user views; and (iv) the page URLs a user visits on the Website, which encode the specific cancer types, treatments, and physicians the user is researching.

30. When a user visits the Website, the user's browser sends an HTTP request to the Website's server to load the page. In response, the server returns the webpage, which contains small pieces of code known as trackers or pixels. The trackers instruct the browser to send the user's interactions—along with identifying data such as cookies, browser details, and device information—to the Third-Party Recipients. As documented below, when a user interacts with the Website, the Trackers transmit the contents of those interactions, together with persistent identifiers and, in the appointment flow, the user's hashed email and telephone number, to the Third-Party Recipients in real time.

31. The transmissions described below are documented in the figures that follow, which are drawn from network-inspection captures and the corresponding HAR (HTTP Archive) files reflecting the real-time requests generated when a user interacts with the Website.

### D. The Appointment-Request Flow Transmits the User's Email and Telephone Number as Hashed Identifiers

32. The appointment-request flow requires the user to supply contact details in order to schedule a new-patient appointment. On submission, the Reddit pixel fires a PageVisit event to

alb.reddit.com and pixel-config.reddit.com, and the X (Twitter) pixel fires a conversion event (pt = "Request a New Patient Appointment | Moffitt") to analytics.twitter.com. The user's email and telephone number appear in these requests as SHA-256 hashes—Reddit's advanced-matching fields auto_em and auto_pn, and X's email_address and phone_number—which both platforms use to match a visitor to a known account in their advertising graphs. Independently hashing the user's actual email and telephone number reproduces the exact hash values transmitted, confirming that the hashes carry the user's real contact details rather than anonymous tokens.

33. A telephone number is drawn from a small, finite set of possibilities—on the order of ten billion combinations—so a SHA-256 hash of a telephone number affords no meaningful de-identification. Any party holding the hash can compute the SHA-256 value of every possible number and identify the matching input within seconds, recovering the original number with no prior relationship to the user and no access to any other data. The hashed telephone number transmitted to Reddit and X is therefore functionally equivalent to transmitting the number in plain text and identifies the user whether the user holds an account with either platform or not. The hashed email address, in turn, resolves to a specific person through the platforms' matching of the incoming hash against the plaintext contact records they already hold—which both maintain for their account holders and routinely acquire for others—so that the email, too, is recoverable for a large share of users.

34. The figures below show each transmission, followed by the hash derivations that tie the transmitted values to the user's email and telephone number.




*Figure 1: The appointment-request flow's PageVisit event transmitted to Reddit (alb.reddit.com), carrying the user's hashed email (auto_em = 9c63f5b4…26e92a50c) and hashed telephone number (auto_pn), with integration = reddit.*




*Figure 2: The appointment event transmitted to X (Twitter) on the confirmation page (pt = "Request a New Patient Appointment | Moffitt"), carrying email_address = 9c63f5b4…26e92a50c and phone_number = 2a0d8da1…992d619e, with tw_document_href pointing to Moffitt's patient registration form.*




*Figure 3: The SHA-256 hash of the user's email address yields 9c63f5b4aa6f988b875f855acdf8b580ddf3cd7ea8f2b8572d4dfca26e92a50c—the exact value transmitted to both Reddit (auto_em) and X (email_address).*




*Figure 4: The SHA-256 hash of the user's telephone number in international format yields 2a0d8da13636a5822d19105de30bcae25dcfa583600ec80a13431931992d619e—the exact value transmitted to X (phone_number).*



*Figure 5: The SHA-256 hash of the same telephone number in national format yields 3013f3019557d552c87128ea3c538099bad15220ea450a9a69ed159d1f817e51—the value carried in Reddit's auto_pn field, confirming the telephone-number hash transmitted to Reddit.*

35. Through these transmissions, Reddit and X acquire the user's email address and telephone number—functionally in the clear—in connection with the user's request for a new-patient appointment at a cancer center, and can match those identifiers to a known individual in their advertising graphs.

**E. The Find a Doctor Flow Transmits the User's Health Criteria and Selected Physician**

36. In the Find a Doctor flow, the user selects a cancer type (for example, Brain Cancer), a provider type (for example, Neurologist / Neuro-Oncology), a location, a gender, and a language; enters free-text keywords (for example, "brain cancer treatment"); and then opens a specific physician's profile. These inputs are encoded in plain text in the page URL and Referer and transmitted to Google (googleadservices.com and googleads.g.doubleclick.net), Microsoft's Bing (bat.bing.com), and X (analytics.twitter.com and t.co). The page title carrying the selected physician's name (for example, "Ali-Musa Jaffer | Moffitt") is sent in each platform's payload (Google tiba, Bing tl, X pt). Each request also carries that platform's persistent identifier—Google's auid, Microsoft's MUID cookie—and, on the same physician page, Reddit transmits a PageVisit (esurl = the physician URL) carrying the same hashed email and telephone number observed in the appointment flow, tying the user's cancer-related browsing to the user's contact identity.

37. The figures below document these transmissions in sequence. The user's health-related search criteria and selected physician are transmitted in plain text to Google (Figures 6–8), to Microsoft's Bing (Figures 9–11), and to X (Figures 12–14)—both on the search-results page and again on the physician's profile page, where each platform additionally receives the specific physician's name. Finally, on the physician's page, Reddit re-attaches the same hashed email and

telephone number observed in the appointment flow (Figure 15), tying the user's cancer-related browsing to the user's contact identity.



*Figure 6: The Find a Doctor search criteria transmitted in plain text to Google Ads: the url and ref parameters carry cancer-type = Brain+Cancer, gender = Male, and query = brain+cancer+treatment, with tiba = "Find a Doctor | Moffitt", the persistent auid = 178257048.1781101182, and hn = www.googleadservices.com.*



*Figure 7: The request headers for the Google transmission: :authority googleads.g.doubleclick.net, path /pagead/viewthroughconversion/…, and a Referer that reproduces the full brain-cancer search criteria.*




*Figure 8: On the physician's profile page, Google Ads receives tiba = "Ali-Musa Jaffer | Moffitt" together with the ref carrying the brain-cancer search criteria and the persistent auid.*




*Figure 9: The search criteria transmitted to Microsoft's Bing Universal Event Tracking tag (bat.bing.com): tl = "Find a Doctor | Moffitt" with the p and r parameters carrying cancer-type = Brain+Cancer, gender = Male, and query = brain+cancer+treatment, and evt = pageLoad.*




*Figure 10: The request headers for the Microsoft transmission: :authority bat.bing.com, the MUID cookie, and a Referer reproducing the brain-cancer search criteria.*




*Figure 11: On the physician's page, the Bing UET tag receives tl = "Ali-Musa Jaffer | Moffitt", identifying the specific neuro-oncology physician viewed.*



Figure 12: *The search transmitted to X (Twitter) as a conversion event: pt = "Find a Doctor | Moffitt" with tw_document_href carrying the brain-cancer criteria, integration = advertiser, p_id = Twitter.*



Figure 13: *The request headers for the X transmission: :authority t.co, path /i/adsct?... reproducing the criteria, with the Cookie header and Sec-Fetch-Site: cross-site.*




*Figure 14: On the physician's page, X receives pt = "Ali-Musa Jaffer | Moffitt" with tw_document_href set to the physician's URL.*




*Figure 15: On the physician's page, Reddit transmits a PageVisit with esurl = https://www.moffitt.org/providers/ali-musa-jaffer/ and the same hashed contact details from the appointment flow—auto_em = 9c63f5b4…26e92a50c and auto_pn—linking the user's brain-cancer-specialist browsing to the user's email and telephone number.*

38. Through these transmissions, the Third-Party Recipients learn the specific cancer type, provider type, and treatment keywords the user searched, and the specific physician the user viewed, keyed to persistent advertising identifiers and—through Reddit's re-attachment of the hashed email and telephone number—to the user's real-world contact identity.

**F. Users' Browsing Activity Across the Website**

39. The interception of users' electronic communications is not limited to the interactions described above. Every page URL a user visits on the Website—including pages describing cancer types, treatments, services, and physicians—is transmitted to the Third-Party Recipients in real time, together with their respective persistent identifiers. Through these transmissions, the Third-Party Recipients learn not only that the user visited the Website, but the specific cancer types, treatments, and physicians the user was researching.

40. This Complaint focuses on the Third-Party Recipients identified above because those are the tracking systems documented here. Discovery may reveal additional third-party recipients or additional tracking products deployed on the Website, including additional advertising products within the Google Marketing Platform, Microsoft's advertising network, and other programmatic-advertising platforms.

**G. Defendant's Responsibility for the Interception of Electronic Communications**

41. Although the Trackers perform the technical acquisition and transmission functions, Moffitt is legally responsible under the FSCA and ECPA because it intentionally procured, enabled, directed, authorized, or caused the Third-Party Recipients to acquire the challenged communications.

42. Moffitt knowingly made the affirmative decision to implement the Trackers on www.moffitt.org. This implementation was deliberate and required Defendant, or persons acting on its behalf, to configure and deploy the Trackers on the Website, including on the appointment-request and Find a Doctor functions. Without Moffitt's implementation and continued operation of this code, the Third-Party Recipients would not have received the electronic communications at issue.

43. Moffitt controls, participates in controlling, or has the contractual or practical ability to control which pages and events on its Website trigger tracking for Moffitt's advertising and analytics purposes. At minimum, Moffitt could elect not to procure or use tracking on sensitive functions—including its appointment-request form, where the user's email and telephone number are collected, and its Find a Doctor search and physician pages, where cancer type, provider type, keywords, and physician selections are disclosed—yet the captured requests show tracking operating on precisely those functions.

**H. Moffitt's Terms of Use and Privacy Policy Do Not Authorize the Tracking Conduct**

44. Moffitt's Website includes a link to an Internet Privacy Policy in the footer of the Website's pages. Users are not required to affirmatively agree to the Privacy Policy before requesting an appointment, running the Find a Doctor search, viewing a physician's profile, or otherwise interacting with the Website.

45. Far from authorizing the tracking conduct, Moffitt's Internet Privacy Policy represents the opposite. The Policy describes only in general terms that Moffitt uses cookies and other data-collection technologies and that it may receive information through social-media plug-ins, and it represents that any disclosure or sale of information to third parties is limited to non-identifiable, aggregate, or anonymized data. A reasonable user reading these representations would understand that his or her sensitive personal and health-related information is not being shared with third-party advertising companies in identifiable form—precisely the opposite of what Moffitt's tracking conduct accomplishes. The real-time transmission of the user's hashed email and telephone number and the user's specific cancer-type, provider, keyword, and physician selections to multiple third-party advertising platforms cannot be reconciled with Moffitt's representation that third-party disclosure is confined to non-identifiable aggregate data.

46. Even if enforceable, Moffitt's privacy disclosures do not operate as consent to Moffitt's use of the Trackers to intercept users' private health-related and personal information and transmit it to third-party advertising companies. Consent is limited to the specific conduct authorized, and a reasonable person would not understand a generic privacy policy—let alone one affirmatively stating that third-party disclosure is limited to non-identifiable, aggregate, or anonymized data—to authorize the real-time interception and transmission of the user's appointment-request contact details, cancer-related search criteria, and physician selections to the Third-Party Recipients for advertising and analytics purposes.

47. Moffitt's privacy disclosures also cannot constitute consent because they are presented as a passive browsewrap arrangement. The Privacy Policy is accessible only through a small-print hyperlink in the Website footer, among numerous other links. Users are not required to take any affirmative action—such as clicking "I agree" or checking a box—before their data is collected and disclosed, and are deemed to "assent" merely by using the Website. Browsewrap terms are enforceable only where the hyperlink to the terms is conspicuous enough to put a reasonably prudent person on inquiry notice before engaging with the website. Moffitt's footer link fails this test.

48. Moffitt maintains a public Terms & Conditions page that governs use of the Website and incorporates its Internet Privacy Policy, but it contains no binding individual arbitration provision and no class-action waiver; it addresses governing law, disclaimers, and acceptable use only. Because Website users are not bound to resolve disputes through individual arbitration and have not waived class proceedings, the claims of the affected users can be pursued collectively.

## I. Moffitt's Conduct Violates HIPAA

49. Moffitt holds itself out as a healthcare organization that owns and operates a cancer hospital, clinics, and a multi-specialty oncology physician practice; provides and coordinates medical care; and maintains information concerning patients' health conditions, care needs, and services sought. Moffitt publishes privacy materials on its Website reflecting that it recognizes obligations under HIPAA in connection with its role.

50. Moffitt is a covered entity under HIPAA within the meaning of 45 C.F.R. § 160.103. It is a health care provider that furnishes and bills for health care through its hospital, clinics, and physician practice. As a covered entity, Moffitt is subject to HIPAA's prohibitions on the unauthorized use and disclosure of PHI. *See* 45 C.F.R. § 164.502(a). Moffitt's embedding of third-party tracking code that transmits PHI to the Third-Party Recipients is an unauthorized disclosure.

51. PHI is defined as "individually identifiable health information" that is transmitted or maintained in electronic or any other form or medium. 45 C.F.R. § 160.103. Individually identifiable health information ("IIHI") is health information that is (1) created or received by a health care provider, health plan, employer, or health care clearinghouse; (2) relates to an individual's past, present, or future physical or mental health or condition, or to the provision of or payment for health care; and (3) either identifies the individual or provides a reasonable basis to believe the individual can be identified. 45 C.F.R. § 160.103.

52. When users interact with the Website—requesting new-patient appointments, running the Find a Doctor search by cancer type and keywords, and opening the profiles of specific oncology physicians—they disclose information relating to the past, present, or future physical health or condition of themselves or the individuals for whom they seek care, and to the provision

of health care. This information is collected by Moffitt in the context of users seeking cancer care and satisfies the first two prongs of the IIHI definition.

53. The identifiers transmitted alongside users' health-related interactions satisfy the third prong. HIPAA's de-identification provision treats a "unique identifying number, characteristic, or code"—including telephone numbers, email addresses, and device identifiers—as an identifier that must be removed for information to qualify for the regulatory safe harbor. 45 C.F.R. § 164.514(b)(2)(i). The user's hashed email and telephone number transmitted to Reddit and X, and the persistent Google auid and Microsoft MUID identifiers transmitted in the Find a Doctor flow, are precisely such identifiers. Because a SHA-256 hash of a telephone number can be reversed within seconds and a hashed email can be matched against records the recipients already hold, the transmitted values identify the individual or provide a reasonable basis to believe the individual can be identified. *See Kane v. Univ. of Rochester*, 2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024) (holding that the IIHI threshold can be satisfied where transmitted data, though seemingly scrambled, can be decoded by the recipient to identify the individual).

54. The health-related information intercepted from Moffitt's Website is highly sensitive. It reveals that the user is seeking cancer care, the specific cancer type and treatment the user is researching, and the specific oncology physician the user selected, linked to the user's email and telephone number. The disclosure of this information to advertising companies exposes users to privacy invasions and to the risk of stigma, discrimination, and targeted exploitation.

55. HIPAA criminalizes the knowing disclosure of individually identifiable health information in violation of HIPAA, with enhanced penalties where the offense is committed with intent to sell, transfer, or use the information for commercial advantage, personal gain, or malicious harm. 42 U.S.C. § 1320d-6. Moffitt did not deploy or procure the Trackers merely for

passive website maintenance. The Trackers were selected and used to obtain advertising, analytics, conversion-measurement, retargeting, audience-building, and lead-generation benefits by transmitting substantive cancer-care communications and contact identifiers to third parties. Those facts support the inference that a purpose of the challenged interception was to disclose and use individually identifiable health information for commercial advantage and that the alleged HIPAA offense was independent of the interception prohibited by the ECPA.

56. Upon information and belief, Moffitt has not executed HIPAA-compliant Business Associate Agreements with the Third-Party Recipients for the tracking activities described herein, and has not obtained the HIPAA-compliant authorizations necessary to permit such disclosures for non-treatment purposes. To the extent Moffitt contends that any Third-Party Recipient acted as its business associate, no agreement would authorize the recipients to receive and use the challenged information for their own advertising, profiling, retargeting, or other independent commercial purposes.

57. Moffitt had actual and constructive knowledge that its deployment of third-party trackers on its Website violated HIPAA. In December 2022, and as updated in March 2024, the U.S. Department of Health and Human Services, Office for Civil Rights, issued guidance expressly warning HIPAA-covered entities and business associates that the use of third-party tracking technologies on websites—including pixels and analytics tools—that transmit PHI to third-party vendors without a valid Business Associate Agreement constitutes an unauthorized disclosure in violation of HIPAA. Moffitt, which publishes its own privacy materials and holds itself out as handling health information subject to HIPAA, cannot credibly claim ignorance of this well-publicized federal guidance. Moffitt's continued deployment of the Trackers reflects a knowing and deliberate choice to prioritize advertising and analytics benefits over its legal obligations.

### J. Plaintiffs' Specific Experiences

#### i. Kathy K. Peoples

58. Plaintiff Kathy K. Peoples is a Florida resident and a cancer patient who suffers from neuroendocrine cancer. Beginning after she relocated to Florida in early 2024, and on more than one occasion over approximately the following two years, Ms. Peoples used the Website to research and locate care for her condition, including in 2025. Ms. Peoples accessed the Website from Florida using the Safari browser on her Apple iPad and Apple iPhone. She did not use ad blockers, "incognito" mode, or a virtual private network, meaning the Trackers embedded on the Website were fully operational during her visits.

59. Before interacting with the Website, Ms. Peoples was not presented with any cookie banner, pop-up, checkbox, clickwrap, or other affirmative request for permission to disclose her searches or her cancer-related browsing information to the Third-Party Recipients.

60. During her visits, Ms. Peoples used the Website's Find a Doctor function to search for a specific neuroendocrine-cancer specialist by name and to research the cancer types, procedures, and treatments Moffitt offers for her condition, and she opened the profiles of specific physicians. In doing so, Ms. Peoples disclosed information concerning her cancer condition and care needs and the specific physicians and treatments she was seeking. In the same manner documented above in Figures 6 through 15, those search criteria and physician selections—encoded in the page URL—were intercepted in real time and transmitted to Google, Microsoft (Bing), X, and Reddit, together with persistent advertising identifiers, all without Ms. Peoples's knowledge or consent. At the time of her searches, Ms. Peoples was signed into her Google account, linking those communications to her authenticated Google identity.

**ii. Michael G. Moore**

61. Plaintiff Michael G. Moore is a Florida resident and a cancer patient who has received and continues to receive treatment at Moffitt. Beginning in September 2025, and on numerous occasions, Mr. Moore and members of his household used the Website in connection with his cancer care—requesting new-patient appointments, exchanging messages and communications, participating in video and Zoom visits, and researching the services and treatments Moffitt offers. Mr. Moore accessed the Website from Florida using a combination of the Google Chrome and Microsoft Edge browsers on a desktop and laptop computer, and the Safari and Google Chrome browsers on his iPhone. He did not use ad blockers, "incognito" mode, or a virtual private network, meaning the Trackers embedded on the Website were fully operational during his visits.

62. Before interacting with the Website, Mr. Moore was not presented with any cookie banner, pop-up, checkbox, clickwrap, or other affirmative request for permission to disclose his contact details or his cancer-related browsing information to the Third-Party Recipients.

63. In connection with obtaining care, Mr. Moore's email address and telephone number were submitted through Moffitt's "Request a New Patient Appointment" process. In the same manner documented above in Figures 1 through 5, those contact details were transmitted to Reddit and X as SHA-256 hashes—functionally in the clear—without Mr. Moore's knowledge or consent, and identify him whether or not he holds an account with either platform.

64. Mr. Moore also used the Website's Find a Doctor function to search by cancer type and treatment protocol and to open the profiles of specific Moffitt physicians. In the same manner documented above in Figures 6 through 15, those search criteria and physician selections—encoded in the page URL—were intercepted in real time and transmitted to Google, Microsoft

(Bing), X, and Reddit, together with persistent advertising identifiers and, on the physician pages, Mr. Moore's hashed email and telephone number. At the time of these searches, Mr. Moore was signed into his Google account, linking those communications to his authenticated Google identity.

**INJURY TO PLAINTIFFS AND CLASS MEMBERS**

65. Moffitt's procurement of the unauthorized interception of Website user communications has caused actual harm to Plaintiffs and Class Members in multiple ways.

66. **Invasion of Privacy.** The health-related and personal information disclosed through users' appointment-request contact details, cancer-type and treatment searches, and physician selections—including the fact that the user is seeking cancer care and the specific conditions, treatments, and providers the user researches for themselves or their loved ones—is among the most private information an individual possesses. Its interception and disclosure to advertising companies can result in significant embarrassment, stigma, and discrimination. Plaintiffs and Class Members have suffered an invasion of privacy through the unauthorized interception of their electronic communications and health-related disclosures, violating their reasonable expectation that their interactions with Moffitt would remain private.

67. **Commercial Exploitation and Loss of Control.** Moffitt allegedly caused Plaintiffs' and Class Members' sensitive communications to be disclosed to advertising and analytics recipients and used the resulting data flows to obtain advertising, measurement, audience, and lead-generation benefits. Plaintiffs and Class Members thereby lost control over information they had communicated for the limited purpose of seeking cancer information, care, and providers. In today's digital economy, personal data—especially health-related information—has significant commercial value, as demonstrated by Moffitt's own use of that data for advertising, analytics, and lead generation.

68. **Diminished Confidence in Healthcare Privacy.** The unauthorized interception of Plaintiffs' and Class Members' communications has undermined their ability to freely and confidentially seek medical information, research cancer care options, and arrange care for themselves and their loved ones without fear that their activities and disclosures are being intercepted by third parties.

69. **Risk of Further Use of Intercepted Data.** Once intercepted by the Third-Party Recipients, Plaintiffs' and Class Members' data is beyond their control and may be further processed, combined with other data, and used for advertising and profiling purposes. By receiving information revealing that a particular user sought cancer care or expressed interest in specific cancer types, treatments, or physicians, an advertising platform can associate that health-related interest with the user or the user's browsing profile and use it to deliver targeted advertising over time. The resulting harm is ongoing and concrete.

70. **Statutory Injury.** Independent of the above harms, Moffitt's violations of the FSCA and ECPA have caused Plaintiffs and Class Members to suffer statutory injury, entitling them to the remedies provided by law, including statutory damages.

## CLASS ACTION ALLEGATIONS

71. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

72. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States who visited Moffitt's Website (www.moffitt.org) and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Moffitt, including Google's advertising and analytics technology, the Microsoft/Bing Universal Event Tracking tag, the X (Twitter) advertising pixel, and/or the Reddit advertising pixel, within the applicable statute of limitations period (the "Nationwide Class").

73. The Florida Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in Florida who visited Moffitt's Website (www.moffitt.org) and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Moffitt, including Google's advertising and analytics technology, the Microsoft/Bing Universal Event Tracking tag, the X (Twitter) advertising pixel, and/or the Reddit advertising pixel, within the applicable statute of limitations period (the "Florida Class").

74. Together, the Nationwide Class and the Florida Class are referred to as the "Class."

75. Excluded from the Class are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) the Third-Party Recipients (Google, Microsoft, X, and Reddit), and their officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned, their immediate family members and staff, and the attorneys for the parties and their staff; and (e) any jurors assigned to this case.

76. Plaintiffs reserve the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

77. **Numerosity.** The Class is so numerous that joinder of all members is impracticable. Moffitt operates one of the largest cancer hospitals in the United States, and its Website receives hundreds of thousands of unique visitors each month. Based on Website-traffic data, the Website receives approximately 705,000 visits per month—on the order of 7.2 million U.S. visits per year—and the appointment-request and Find a Doctor functions are core, prominently promoted navigation features. The number of individuals whose communications were intercepted by the Trackers during the relevant period is estimated to be in the hundreds of thousands. The precise number and identities of Class Members are within Defendant's and the Third-Party Recipients' records.

78. **Ascertainability.** The Class is ascertainable because its members can be identified through objective criteria using records maintained by Defendant and third parties. Moffitt's web-

server logs, appointment-request records, and the advertising and analytics account records of the Third-Party Recipients contain records of visitors whose electronic communications were intercepted by the Trackers during the applicable limitations period, including IP addresses, cookie and advertising identifiers, hashed contact identifiers, timestamps, and the specific pages, searches, and form interactions involved. In addition, Moffitt collects names, contact information, and appointment details from users who submit the appointment-request form, providing objective, reliable means of identifying Class Members.

79. **Commonality and Predominance.** There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a) Whether Moffitt implemented the Trackers on its Website;

(b) Whether the Trackers intercepted Website users' electronic communications;

(c) Whether Moffitt procured, enabled, and aided and abetted the interception of Website users' electronic communications;

(d) Whether Moffitt obtained Website users' consent to procure the interception of their electronic communications;

(e) Whether Moffitt's conduct violated Fla. Stat. § 934.03;

(f) Whether Moffitt's conduct violated 18 U.S.C. § 2511;

(g) Whether Moffitt breached a duty of confidence owed to Plaintiffs and Class Members;

(h) Whether Moffitt has been unjustly enriched through its conduct;

(i) Whether Plaintiffs and Class Members are entitled to damages and other monetary relief, and if so, in what amount; and

(j) Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief.

80. These common questions predominate over any individualized issues because Plaintiffs' claims challenge Moffitt's uniform, centralized conduct—the deployment of the same tracking code across its Website, including its appointment-request and Find a Doctor functions—rather than any individualized interaction between Moffitt and a particular Class Member. The Trackers operated in the same manner on every visitor's session, intercepting the same categories of data and transmitting that data to the same third parties using the same identifiers. Liability can therefore be established on a class-wide basis through common technical and documentary proof, including Moffitt's Website source code, its arrangements with the Third-Party Recipients, and the technical operation of the Trackers.

81. Any individualized questions—such as the specific pages a given Class Member visited or the precise dates of their visits—do not predominate. Courts routinely hold that predominance is satisfied in healthcare website tracking cases because the core liability inquiry focuses on the defendant's uniform deployment of tracking technology without consent, not on the content of any individual user's browsing session.

82. **Typicality.** Plaintiffs' claims are typical of the claims of the other Class Members. Plaintiffs and Class Members all visited Moffitt's Website and had their electronic communications intercepted by the Third-Party Recipients without their consent, arising from the same practices and course of conduct and based on the same legal theories.

83. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests adverse or antagonistic to those of the Class, and have retained counsel experienced in complex class action litigation, including class actions involving privacy violations,

unlawful data collection, and the interception of electronic communications in the healthcare context. Plaintiffs' counsel have the resources, expertise, and commitment to prosecute this action vigorously through discovery, class certification, trial, and any appeals.

84. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members to individually redress the wrongs done to them. Prosecution of separate actions would create a risk of inconsistent or varying adjudications. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

85. **Injunctive and Declaratory Relief.** Moffitt has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole under Rule 23(b)(2).

86. **Issue Certification.** Alternatively, Plaintiffs seek certification of the common issues identified above under Rule 23(c)(4). Certification of those issues would materially advance the litigation, promote uniform adjudication of Defendant's common conduct, and narrow any individualized questions that may remain after the class-wide issues are resolved.

## CAUSES OF ACTION

### COUNT I
### Violation of the Florida Security of Communications Act
### (Fla. Stat. § 934.03)
### (On Behalf of Plaintiffs and the Florida Class)

87. Plaintiffs incorporate paragraphs 1–86 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Class.

88. The FSCA prohibits intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any electronic communication.

Fla. Stat. § 934.03(1)(a). The FSCA is an all-party consent statute, requiring the consent of all parties to the communication. Fla. Stat. § 934.03(2)(d).

89. The FSCA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3). It defines "contents" as "any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7). The FSCA was "designed to protect precisely the information at issue in this case—private medical information." *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *4 (M.D. Fla. Mar. 6, 2025).

90. The Trackers deployed on Moffitt's Website constitute "electronic, mechanical, or other device[s]" within the meaning of the FSCA. Unlike session-replay technology that merely records mouse movements, the Trackers here actively intercept and transmit the contents of users' communications, including the user's appointment-request contact details and the user's cancer-type, provider, keyword, and physician selections.

91. The transmissions between Plaintiffs and Class Members and Moffitt's Website constitute "electronic communications" within the meaning of the FSCA because they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system. Fla. Stat. § 934.02(12).

92. The Trackers intercept the "contents" of Plaintiffs' and Class Members' electronic communications, not merely routing or addressing information. The user's hashed email and telephone number, cancer-type and keyword search criteria, and physician selections transmitted to the Third-Party Recipients plainly concern the "substance, purport, or meaning" of the user's communication within the meaning of Fla. Stat. § 934.02(7). Likewise, the URLs of the search-

results and physician pages a user visits—and the plain-text search criteria embedded in those URLs—encode the specific cancer types, treatments, and physicians being researched and therefore constitute "contents" rather than mere routing information. *See W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *4–5 (holding that URLs reflecting medical services sought constitute "contents" under the FSCA); *Goldstein v. Costco Wholesale Corp.*, 559 F. Supp. 3d 1318, 1321 (S.D. Fla. 2021) (URLs may constitute "contents" where they reveal substantive information about a user's activity). Moffitt's conduct is readily distinguishable from the collection of "basic analytic data" in a "generic commercial setting" at issue in *Jacome v. Spirit Airlines, Inc.*, 2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021), because the data intercepted here is confidential, health-related information the FSCA was enacted to protect.

93. Moffitt intentionally procured the Third-Party Recipients to intercept these electronic communications by deliberately implementing the Trackers on its Website. Plaintiffs and Class Members did not consent to this interception.

94. As a direct result of Moffitt's violations, Plaintiffs and Class Members are entitled to: (a) actual damages, or liquidated statutory damages computed at the higher of $100 per day for each day of violation or $1,000; (b) punitive damages; and (c) reasonable attorneys' fees and costs of litigation. Fla. Stat. § 934.10.

95. Plaintiffs and Class Members are also entitled to injunctive relief to prevent Moffitt from continuing to deploy the Trackers to intercept their electronic communications without proper consent.

**COUNT II**
**Violation of the Electronic Communications Privacy Act**
**(18 U.S.C. § 2511 et seq.)**
**(On Behalf of Plaintiffs and the Nationwide Class)**

96. Plaintiffs incorporate paragraphs 1–86 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

97. The ECPA prohibits the intentional interception of electronic communications and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

98. The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2520(a).

99. The transmissions between Plaintiffs and Class Members and Moffitt's Website are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce, and therefore constitute "electronic communications" within the meaning of the ECPA. 18 U.S.C. § 2510(12).

100. The Trackers intercepted the "contents" of Plaintiffs' and Class Members' electronic communications within the meaning of the ECPA, for the same reasons set forth above with respect to the FSCA.

101. Although the ECPA contains a one-party consent exception, 18 U.S.C. § 2511(2)(d), that exception does not apply where a communication is intercepted for the purpose of committing a criminal or tortious act in violation of federal or state law. Moffitt procured these interceptions at least in part for the purpose of disclosing and using users' individually identifiable health information through third-party advertising and analytics systems to obtain commercial advantages, including conversion measurement, retargeting, audience building, lead generation,

and new-patient enrollments. That disclosure and use of individually identifiable health information—separate from the act of interception itself—violated HIPAA's criminal prohibition where undertaken knowingly and with intent to transfer or use the information for commercial advantage. 42 U.S.C. § 1320d-6. That same disclosure independently constituted the tort of breach of confidence, as alleged in Count III below. The captured transmission of hashed contact identifiers and plain-text cancer-care searches with persistent identifiers, the placement of advertising technologies on functions soliciting those communications, Moffitt's privacy representations, and its continued receipt of marketing and enrollment benefits support the inference of that unlawful purpose. Whether Moffitt possessed that purpose and the requisite knowledge is a fact-intensive issue that should be resolved on a complete evidentiary record. *See Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025); *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *6–7 (M.D. Fla. Mar. 6, 2025); *Kurowski v. Rush Sys. for Health*, 2023 WL 2349606 (N.D. Ill. Mar. 3, 2023).

102. Moffitt's knowing violation of HIPAA is supported by, among other things, its own publication of privacy materials and its awareness of the HHS Office for Civil Rights guidance warning that tracking technologies on healthcare websites that transmit PHI without a valid Business Associate Agreement violate HIPAA.

103. That Moffitt may have been motivated by commercial purposes does not preclude application of the crime-tort exception. *See Stein*, 2025 WL 580556, at *6 ("The language of the statute gives no hint that conduct falls outside the reach of the statute if a person acted based on financial motivations.").

104. Moffitt intentionally procured the Third-Party Recipients to intercept these electronic communications by deliberately implementing the Trackers on its Website, within the

meaning of 18 U.S.C. § 2511(1)(a). Users did not consent to Moffitt's procurement of third-party interception or to the sharing of their appointment-request contact details, cancer-related search criteria, physician selections, and associated identifiers for advertising, analytics, retargeting, or conversion-optimization purposes.

105. Moffitt was not acting under color of law when procuring these interceptions, and no other exception to ECPA liability applies.

106. As a direct result of Moffitt's violations, Plaintiffs and Class Members are entitled to: (a) actual damages, or statutory damages of the greater of $100 per day per violation or $10,000; (b) punitive damages; and (c) reasonable attorneys' fees and costs. 18 U.S.C. § 2520.

**COUNT III**
**Breach of Confidence**
**(On Behalf of Plaintiffs and the Nationwide Class)**

107. Plaintiffs incorporate paragraphs 1–86 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

108. A common law breach of confidence claim requires an "unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 932 (11th Cir. 2020) (en banc). The claim "is rooted in the concept that the law should recognize some relationships as confidential to encourage uninhibited discussions between the parties involved," and traditionally arises in the context of close professional relationships, such as those between patients and medical providers. *Id.*

109. Under Florida law, a confidential relationship exists where "confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002). Whether a confidential relationship exists is

typically a question of fact not appropriately resolved on a motion to dismiss. *See Drewes v. Cetera Fin. Grp., Inc.*, 2020 WL 13880994, at *4 (S.D. Fla. Dec. 21, 2020).

110. A confidential relationship existed between Moffitt and Plaintiffs and Class Members. Moffitt holds itself out as a National Cancer Institute–designated cancer center that furnishes medical care, publishes privacy materials representing that it safeguards the information users submit, and invites users to disclose their cancer conditions, symptoms, care needs, treatment interests, provider preferences, and contact information through the Website for the purpose of obtaining care. Users reposed confidence in Moffitt when making those disclosures, and Moffitt accepted that trust. Plaintiffs' relationships with Moffitt extended well beyond a single interaction with a public-facing website: each Plaintiff used the Website on more than one occasion to research a cancer condition and to locate and select a physician to treat it. Plaintiff Kathy K. Peoples used the Website to identify a Moffitt specialist and seek treatment for her cancer; and Plaintiff Michael G. Moore is a Moffitt patient who received and continues to receive cancer treatment at Moffitt and communicated with Moffitt through its patient portal.

111. The information Moffitt disclosed is nonpublic. It includes Plaintiffs' and Class Members' plain-text Find a Doctor search criteria identifying the cancer types, treatments, and providers they were researching; the email addresses and telephone numbers they provided through the "Request a New Patient Appointment" process; the specific physicians they selected; and the URLs encoding the specific cancer types, treatments, services, and physicians they viewed. None of this information was publicly available. It existed only because users affirmatively communicated it to Moffitt, and Moffitt learned it within the confidential relationship described above.

112. Moffitt disclosed that nonpublic information to third parties. By deploying or procuring the Trackers on the Website, Moffitt caused users' communications to be transmitted in real time to the Third-Party Recipients—Google, Microsoft, X, and Reddit—together with persistent cookies and identifiers, and the users' hashed email addresses and telephone numbers, permitting those recipients to link the communications to the same browser, device, account, or user. The Third-Party Recipients are advertising and analytics companies that play no role in furnishing users' cancer care, and they received the information for their own independent commercial purposes. *See W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *8 (M.D. Fla. Mar. 6, 2025) (allegations that tracking technologies gathered and transmitted a plaintiff's protected health information, including searches for physicians, medical conditions, and treatment-related information, to third parties sufficiently stated a claim for breach of confidence).

113. The disclosures were unconsented and unprivileged. Plaintiffs and Class Members were never presented with a cookie banner, pop-up, checkbox, clickwrap, or any other affirmative request for permission before their communications were transmitted, and they never authorized Moffitt to disclose their cancer-related communications to advertising and analytics companies. Moffitt's footer-linked Internet Privacy Policy did not obtain consent and represented the opposite—that any disclosure of user information to third parties is limited to non-identifiable, aggregate, or anonymized data. No privilege, authorization, or other legal justification permitted these disclosures; to the contrary, HIPAA prohibited them, and Moffitt obtained no HIPAA-compliant authorization from any user.

114. Moffitt breached the confidence reposed in it. It made the deliberate decision to deploy or procure the Trackers on precisely those functions through which users disclose sensitive cancer, provider, and contact information, and it did so with knowledge—including from the HHS

Office for Civil Rights guidance described above—that doing so transmits protected health information to third-party vendors in violation of its legal and ethical obligations. Moffitt could have declined to place tracking technologies on those functions. Instead, it maintained them and accepted the advertising, analytics, attribution, audience, lead-generation, and new-patient-enrollment benefits the disclosures produced.

115. As a direct and proximate result of Moffitt's breach of confidence, Plaintiffs and Class Members have been injured. They suffered an invasion of privacy, lost control over their confidential health information, sustained a diminished ability to seek medical information and care in confidence, and face the ongoing risk that the disclosed information will be further processed, combined with other data, and used for profiling and targeted advertising. Plaintiffs and Class Members are entitled to compensatory and nominal damages, and to injunctive relief prohibiting Moffitt from further disclosing their confidential information without consent.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

116. Plaintiffs incorporate paragraphs 2–4, 10, 12–19, 20–40, 58–64, 67, and 71–86 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class. This Count does not incorporate the paragraphs alleging Defendant's violations of the FSCA, the ECPA, or HIPAA, its breach of confidence, or Plaintiffs' specific experiences and injuries, or the injury allegations of Counts I–III, because this Count does not depend on any of them.

117. Plaintiffs plead this Count in the alternative to Counts I, II, and III, and to the extent Plaintiffs and Class Members are found to have no adequate remedy at law. This Count does not rely on Moffitt's statutory violations or its breach of confidence to supply the unjust factor. It rests

instead on the independent equitable principle that Moffitt solicited, received, and retained the benefit of Plaintiffs' and Class Members' valuable personal and health-related data without conferring any compensation in return, and that retaining that benefit without paying its fair value is inequitable irrespective of whether the conduct that produced it is ultimately adjudged unlawful.

118. Moffitt received a benefit from Plaintiffs and Class Members by inducing them to provide valuable personal and health-related data through the Website's appointment-request, Find a Doctor, and physician-profile functions, and then putting that data to use for its own commercial purposes.

119. By implementing the Trackers on its Website, Moffitt obtained analytics, conversion measurement, retargeting, audience-building, advertising attribution, and lead-generation benefits. Those benefits enabled Moffitt to qualify and route leads, improve advertising efficiency, and increase the volume of care referrals, new-patient appointments, and services, thereby enriching itself at the expense of Plaintiffs and Class Members.

120. Private information, at least in the context of sensitive health-related information, has value. *See W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *10.

121. Moffitt knowingly accepted and retained the advertising, analytics, attribution, audience, and lead-generation benefits produced through the challenged transmissions. Moffitt has never compensated Plaintiffs or Class Members for the data that generated those benefits, and it would be inequitable for Moffitt to retain the value it received without paying fair value for it.

122. Because Moffitt retained a benefit conferred by Plaintiffs and Class Members without paying its fair value, Plaintiffs and Class Members are entitled to restitution and disgorgement of the profits, benefits, and other compensation Moffitt obtained from the use of their personal and health-related data.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all other Class Members similarly situated, respectfully request that this Court:

(a) Certify this case as a class action on behalf of the proposed Class, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

(b) Declare that Moffitt's actions, as described herein, violate the FSCA and the ECPA and constitute a breach of confidence and unjust enrichment;

(c) Award Plaintiffs and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiffs and the Class statutory damages as provided by the FSCA and the ECPA;

(e) Award Plaintiffs and the Class punitive damages;

(f) Award Plaintiffs and the Class restitution and disgorgement of all profits, benefits, and other compensation Moffitt obtained from the use of Plaintiffs' and Class Members' personal and health-related data;

(g) Award injunctive relief requiring Moffitt to cease procuring the interception of Website users' communications without proper consent; to disable or segregate the Trackers from its appointment-request, Find a Doctor, physician-profile, and other health-related functions unless valid consent and authorization are obtained; to request deletion of improperly transmitted data from the Third-Party Recipients to the extent within Moffitt's control or contractual rights; and to implement appropriate safeguards to protect Website users' privacy in the future;

(h) Award Plaintiffs and the Class pre-judgment and post-judgment interest;

(i) Award Plaintiffs and the Class reasonable attorneys' fees and costs, as allowed by law; and

(j) Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: August 20th, 2026

Respectfully submitted,

By: */s/ Adam A. Schwartzbaum*

Adam A. Schwartzbaum, Esq.,
**LEAD COUNSEL**
Florida Bar No. 93014
SCHWARTZBAUM
14 NE 1st Ave Ste 705
Miami, FL 33132
Telephone: 786-453-8485
Primary Email: adam@schwartzbaum.com
Secondary Email:
admin@schwartzbaum.com

*Counsel for Plaintiffs and the Proposed Class*