**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KATHY K. PEOPLES and MICHAEL G. MOORE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

H. LEE MOFFITT CANCER CENTER AND RESEARCH INSTITUTE, INC.,

Defendant.
_________________________________/

CASE NO. 8:26-cv-02433-MSS-GDP

**CLASS ACTION**

**JURY TRIAL DEMANDED**

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Kathy K. Peoples and Michael G. Moore (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this First Amended Class Action Complaint against Defendant H. Lee Moffitt Cancer Center and Research Institute, Inc. ("Moffitt" or "Defendant"), and allege as follows based on personal knowledge as to Plaintiffs' own acts and on information and belief as to all other matters:

## NATURE OF THE ACTION

1. This is a class action arising from Moffitt's collection and disclosure of website visitors' sensitive personal and health-related information and electronic communications to Google LLC ("Google"), Microsoft Corporation ("Microsoft"), X Corp. ("X" or "Twitter"), and Reddit, Inc. ("Reddit") (collectively, the "Third-Party Recipients"), without prior notice and consent, through tracking technologies embedded in Defendant's website, www.moffitt.org (the "Website"). Moffitt's conduct is directly contrary to the representations in its Internet Privacy Policy that Moffitt shares users' Personal Information with outside service providers only for

processing “solely on [Moffitt’s] behalf,” and otherwise discloses to third parties only non-identifiable, aggregate, or anonymized information.

2. H. Lee Moffitt Cancer Center and Research Institute is a Tampa, Florida–based, National Cancer Institute–designated Comprehensive Cancer Center and one of the largest cancer hospitals in the United States. Opened in 1986 and headquartered in Tampa, Florida, Moffitt operates a cancer hospital, clinics, and a multi-specialty oncology physician practice, and reported approximately $3.017 billion in total revenues and other support in its 2025 fiscal year. Through the Website, Moffitt enables prospective and existing patients to request new-patient appointments, research cancer types and treatments, locate and select physicians, and communicate with the institution about their cancer care.

3. The Website functions as a cancer-care–seeking tool. In the appointment-request flow, a prospective patient supplies contact details—including an email address and telephone number—in order to schedule a new-patient appointment. In the “Find a Doctor” flow, users select a cancer type, provider type, location, gender, and language; enter free-text keywords describing the care they seek; and open the profile of a specific physician. In each instance, users disclose sensitive information about their own cancer-related conditions and care needs, or those of the individuals for whom they seek care.

4. Unbeknownst to Website visitors, Moffitt has knowingly implemented tracking tools operated by the Third-Party Recipients, including Google’s advertising and analytics technology (operated by Google), the Microsoft/Bing Universal Event Tracking tag (operated by Microsoft), the X (Twitter) advertising pixel (operated by X), and the Reddit advertising pixel (operated by Reddit) (collectively, the “Trackers,” and each individually, a “Tracker”). In the appointment-request flow, the contact details a prospective patient enters—email address and

telephone number—are transmitted to Reddit and X as SHA-256 hashes that serve as cross-platform identity-match keys. In the Find a Doctor flow, the user's health-related search criteria (cancer type, provider type, and free-text keywords) and the specific physician viewed are transmitted in plain text to Google, Microsoft (Bing), X, and Reddit alongside persistent advertising identifiers; and on the physician's page, Reddit re-attaches the same hashed email and telephone number observed in the appointment flow, linking the user's cancer-related browsing to the user's real-world contact identity.

5. What aggravates Moffitt's conduct is the timing and manner of these disclosures. Users are never asked to agree to any terms and conditions before they interact with the Website, and are never presented with a cookie banner, pop-up, checkbox, or any clickwrap agreement. Instead, the Website transmits users' appointment-request contact details and Find a Doctor search criteria, provider selections, and browsing activity to the Third-Party Recipients in real time as they occur. Moffitt's Internet Privacy Policy appears only as a small-print hyperlink in the Website footer—where users have no occasion to encounter it before their information has already been intercepted and transmitted—and represents that Moffitt shares users' Personal Information with outside service providers only for processing "solely on [Moffitt's] behalf," and otherwise discloses to third parties only non-identifiable, aggregate, or anonymized information.

6. This interception of private electronic communications occurs without appropriate notice to visitors and without their consent, in violation of (1) the Florida Security of Communications Act, Fla. Stat. § 934.01, *et seq.* ("FSCA"), and (2) the federal Electronic Communications Privacy Act, 18 U.S.C. § 2511 *et seq.* ("ECPA").

7. Under the FSCA, it is unlawful to intentionally intercept, endeavor to intercept, or procure any other person to intercept any wire, oral, or electronic communication without the

consent of all parties to the communication. Moffitt violated the FSCA by deliberately embedding tracking technologies on its Website that procured the Third-Party Recipients to intercept users' private electronic communications—including their appointment-request contact details and their cancer-type, provider, and free-text search criteria and physician selections—in real time, without the knowledge or consent of any party to those communications.

8. Under the ECPA, similar protections exist at the federal level. Although the ECPA contains a one-party consent exception, that exception does not apply here because Moffitt procured the interceptions for the purpose of committing a criminal or tortious act—specifically, the unauthorized use and disclosure of individually identifiable health information for commercial advantage in violation of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6.

9. Moffitt contends that it is immune from suit because a Florida statute deems it an instrumentality of the State "for purposes of sovereign immunity." Fla. Stat. § 1004.43(1). That state-law status cannot defeat Plaintiffs' federal claim, because a State has no power to confer immunity from a federal cause of action. Nor is Moffitt an arm of the State entitled to Eleventh Amendment immunity. It is a privately incorporated nonprofit hospital system whose own board elects 19 of its 21 directors, whose Chief Executive Officer controls all its funds, whose state appropriations and dedicated state tax revenue together supply about three percent of its revenue, and which pays its own liabilities from its own funds and commercial insurance. The conduct challenged here—running commercial advertising and analytics tools on a patient-acquisition website—is not a sovereign function.

10. Through this action, Plaintiffs seek to hold Moffitt accountable for these privacy violations, to obtain appropriate remedies for affected individuals, and to prevent the continued procurement of interception of electronic communications through Defendant's Website.

**PARTIES**

11. Plaintiff Kathy K. Peoples is an adult citizen and resident of the State of Florida, residing in Beverly Hills, Citrus County, Florida.

12. Plaintiff Michael G. Moore is an adult citizen and resident of the State of Florida, residing in Hernando, Citrus County, Florida.

13. Defendant H. Lee Moffitt Cancer Center and Research Institute, Inc. is a not-for-profit corporation organized and existing under the laws of the State of Florida, incorporated in 1984 and operating under Fla. Stat. § 1004.43, with its principal place of business at 12902 USF Magnolia Drive, Tampa, Florida 33612, located in Hillsborough County. Moffitt is a National Cancer Institute–designated Comprehensive Cancer Center and one of the largest cancer hospitals in the United States, reporting approximately $3.017 billion in total revenues and other support in its 2025 fiscal year. Moffitt is the sole corporate member of a consolidated system of subsidiaries, including H. Lee Moffitt Cancer Center & Research Institute Hospital, Inc., which provides patient care; H. Lee Moffitt Cancer Center & Research Institute Lifetime Cancer Screening Center, Inc., doing business as Moffitt Medical Group, which employs and manages physicians; and Moffitt Technologies Corporation, a for-profit subsidiary through which Moffitt conducts commercial activities unrelated to its tax-exempt purpose, including the commercialization of intellectual property. Moffitt develops, maintains, operates, and controls the Website, including the tracking technologies deployed on it.

14. Moffitt's own Internet Privacy Policy identifies the Website as among the services of "H. Lee Moffitt Cancer Center & Research Institute, Inc. and its subsidiaries" and states that

"Moffitt is the data controller of the information we collect." The Privacy Policy does not identify the University of South Florida, the Florida Board of Governors, or the State of Florida as an operator or controller of the Website. Plaintiffs cite the Privacy Policy only as Moffitt's own statement about who operates the Website, and not as an agreement binding on Plaintiffs or Class Members. Moffitt's Terms and Conditions of Use likewise describe the Website as "the website . . . of the H. Lee Moffitt Cancer Center and Research Institute, Inc. and its subsidiaries," and assert that "Moffitt has Proprietary Rights in the Materials on the Website." If discovery shows that a Moffitt subsidiary or affiliate holds the accounts or contracts for any of the Trackers, Plaintiffs will seek leave to add that entity.

## JURISDICTION AND VENUE

15. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges claims arising under federal law, namely the ECPA, 18 U.S.C. § 2511, *et seq.*

16. This Court has supplemental jurisdiction over Plaintiffs' state-law claim under 28 U.S.C. § 1367(a) because that claim is so related to the federal claim that it forms part of the same case or controversy under Article III of the United States Constitution.

17. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed Class, and at least one member of the Class is a citizen of a state different from Defendant, which is a citizen of Florida. Moffitt is not a State, a State official, or another governmental entity against which the Court may be foreclosed from ordering relief, for the reasons alleged in Section I below.

18. This Court has personal jurisdiction over Defendant because Moffitt is a Florida corporation with its principal place of business in Tampa, Florida, within this District, and operates

and controls the Website from Florida. The acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

19. Venue is proper in the Tampa Division of the Middle District of Florida under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant resides in this District and maintains its principal place of business at 12902 USF Magnolia Drive, Tampa, Florida, which is in Hillsborough County within the Tampa Division. A substantial part of the events or omissions giving rise to the claims occurred in this District, because the tracking conduct at issue is deployed from Moffitt's centralized Website, which is operated, maintained, and controlled from this District, and the Website is accessible to and used by consumers throughout the District.

20. No state-law notice-of-claim or presuit requirement applies to Plaintiffs' ECPA claim. A State cannot condition or limit a federal cause of action through its own procedural or immunity rules. *Felder v. Casey*, 487 U.S. 131 (1988); *Howlett v. Rose*, 496 U.S. 356 (1990). Plaintiffs' FSCA claim seeks only declaratory and injunctive relief, not damages.

## FACTUAL ALLEGATIONS

### A. Overview of Website Tracking on Healthcare Websites

21. Many websites employ tracking technologies that collect personal data about users' online activities. These technologies have become ubiquitous across the internet, collecting vast amounts of data about user behavior, preferences, and interests. In the healthcare context, they are particularly concerning because they can capture sensitive medical information, including the types of care a user is researching, the providers a user is seeking, and the conditions a user or a user's loved one may be experiencing.

22. The interception of healthcare-related communications through these tracking technologies is especially problematic because it can reveal highly personal and sensitive medical conditions, treatment interests, and care-seeking behaviors to third parties without patients'

knowledge or explicit consent. That concern is heightened where, as here, the conduct being researched is cancer diagnosis and treatment.

23. As detailed below, Moffitt has implemented tracking technologies on its Website that result in the Third-Party Recipients' unauthorized interception of visitors' electronic communications.

**B. The Tracking Technologies Deployed on the Website**

24. Google is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms and generates most of its revenue through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its products and services, which it then leverages to deliver targeted advertisements. Moffitt has implemented Google's advertising and analytics technologies on its Website, including Google Tag Manager and Google Ads conversion-tracking tags reporting to conversion identifiers 962983927 and 1008553342, which transmit user interactions to Google endpoints such as googleadservices.com and googleads.g.doubleclick.net. Those transmissions carry Google's persistent advertising identifier ("auid") and Google's IDE and DSID advertising cookies, which Google can use to recognize and link activity associated with the same browser, device, or account across interactions and contexts. Google uses the DSID cookie to identify users who are signed into a Google account when they visit non-Google websites, so that where a user is signed into a Google account, Google can associate the transmitted activity with that authenticated account.

25. Microsoft is a multinational technology company headquartered in Redmond, Washington. Microsoft collects user data through services including its Bing search and advertising network (Microsoft Advertising) and its Universal Event Tracking ("UET") tag. Moffitt has implemented Microsoft's Bing UET tag on its Website under at least two tag

identifiers, 5947320 and 4063368, loaded through Google Tag Manager. When a user interacts with a page carrying the tag, information about the user's actions is automatically transmitted to Microsoft (via requests to endpoints such as bat.bing.com), together with the "MUID" (Microsoft User ID) cookie—a persistent, browser-level identifier that Microsoft uses to recognize and link activity associated with the same browser across interactions and websites using Microsoft tracking technologies.

26. X Corp. operates the social-media and advertising platform formerly known as Twitter, together with its advertising pixel and conversion-tracking technology. Moffitt has implemented the X (Twitter) advertising pixel on its Website, which transmits information about users' interactions to X (via requests to endpoints such as analytics.twitter.com and t.co), together with X's advertising identifiers and, in the appointment-request flow, the user's hashed email address ("email_address") and hashed telephone number ("phone_number").

27. Reddit, Inc. operates the social-media and advertising platform Reddit, together with its advertising pixel. Moffitt has implemented the Reddit advertising pixel on its Website under pixel identifier a2_gom7bntiwgl4, which transmits "PageVisit" and related events to Reddit endpoints (such as alb.reddit.com and pixel-config.reddit.com), together with Reddit's persistent advertising identifiers and the user's hashed email address ("auto_em") and hashed telephone number ("auto_pn").

28. Each of the Third-Party Recipients' privacy disclosures confirms that it uses the data it collects to advertise and market to users, including by targeting advertising and combining data collected from different contexts to build unified profiles.

**C. Moffitt Shares Users' Private Health Information with Third Parties**

29. Through the Website, users perform a range of activities, including requesting new-patient appointments; researching cancer types, treatments, services, and providers; running the

Find a Doctor search; and opening the profiles of specific physicians. In doing so, users communicate private and personal information via the Website, including protected health information ("PHI"). Unbeknownst to the Website's users, Moffitt surreptitiously shares this private and protected information with the Third-Party Recipients, without users' consent.

30. Specifically, and as documented in the figures below, Moffitt shares with the Third-Party Recipients, without users' knowledge or consent, the following categories of user communications: (i) the email address and telephone number a user enters into the "Request a New Patient Appointment" form; (ii) the user's Find a Doctor search criteria, including cancer type, provider type, location, gender, language, and free-text keywords; (iii) the specific physician whose profile the user views; and (iv) the page URLs a user visits on the Website, which encode the specific cancer types, treatments, and physicians the user is researching.

31. When a user visits the Website, the user's browser sends an HTTP request to the Website's server to load the page. In response, the server returns the webpage, which contains small pieces of code known as trackers or pixels. The trackers instruct the browser to send the user's interactions—along with identifying data such as cookies, browser details, and device information—to the Third-Party Recipients. As documented below, when a user interacts with the Website, the Trackers transmit the contents of those interactions, together with persistent identifiers and, in the appointment flow, the user's hashed email and telephone number, to the Third-Party Recipients in real time.

32. The transmissions described below are documented in the figures that follow, which are drawn from network-inspection captures and the corresponding HAR (HTTP Archive) files reflecting the real-time requests generated when a user interacts with the Website.

**D. The Appointment-Request Flow Transmits the User's Email and Telephone Number as Hashed Identifiers**

33. The appointment-request flow requires the user to supply contact details in order to schedule a new-patient appointment. On submission, the Reddit pixel fires a PageVisit event to alb.reddit.com and pixel-config.reddit.com, and the X (Twitter) pixel fires a conversion event (pt = "Request a New Patient Appointment | Moffitt") to analytics.twitter.com. The user's email and telephone number appear in these requests as SHA-256 hashes—Reddit's advanced-matching fields auto_em and auto_pn, and X's email_address and phone_number—which both platforms use to match a visitor to a known account in their advertising graphs. Independently hashing the user's actual email and telephone number reproduces the exact hash values transmitted, confirming that the hashes carry the user's real contact details rather than anonymous tokens.

34. A telephone number is drawn from a small, finite set of possibilities—on the order of ten billion combinations—so a SHA-256 hash of a telephone number affords no meaningful de-identification. Any party holding the hash can compute the SHA-256 value of every possible number and identify the matching input within seconds, recovering the original number with no prior relationship to the user and no access to any other data. The hashed telephone number transmitted to Reddit and X is therefore functionally equivalent to transmitting the number in plain text and identifies the user whether the user holds an account with either platform or not. The hashed email address, in turn, resolves to a specific person through the platforms' matching of the incoming hash against the plaintext contact records they already hold—which both maintain for their account holders and routinely acquire for others—so that the email, too, is recoverable for a large share of users.

35. The figures below show each transmission, followed by the hash derivations that tie the transmitted values to the user's email and telephone number.




*Figure 1: The appointment-request flow's PageVisit event transmitted to Reddit (alb.reddit.com), carrying the user's hashed email (auto_em = 9c63f5b4…26e92a50c) and hashed telephone number (auto_pn), with integration = reddit.*




*Figure 2: The appointment event transmitted to X (Twitter) on the confirmation page (pt = "Request a New Patient Appointment | Moffitt"), carrying email_address = 9c63f5b4…26e92a50c and phone_number = 2a0d8da1…992d619e, with tw_document_href pointing to Moffitt's patient registration form.*




*Figure 3: The SHA-256 hash of the user's email address yields 9c63f5b4aa6f988b875f855acdf8b580ddf3cd7ea8f2b8572d4dfca26e92a50c—the exact value transmitted to both Reddit (auto_em) and X (email_address).*




*Figure 4: The SHA-256 hash of the user's telephone number in international format yields 2a0d8da13636a5822d19105de30bcae25dcfa583600ec80a13431931992d619e—the exact value transmitted to X (phone_number).*




*Figure 5: The SHA-256 hash of the same telephone number in national format yields 3013f3019557d552c87128ea3c538099bad15220ea450a9a69ed159d1f817e51—the value carried in Reddit's auto_pn field, confirming the telephone-number hash transmitted to Reddit.*

36. Through these transmissions, Reddit and X acquire the user's email address and telephone number—functionally in the clear—in connection with the user's request for a new-patient appointment at a cancer center, and can match those identifiers to a known individual in their advertising graphs.

**E. The Find a Doctor Flow Transmits the User's Health Criteria and Selected Physician**

37. In the Find a Doctor flow, the user selects a cancer type (for example, Brain Cancer), a provider type (for example, Neurologist / Neuro-Oncology), a location, a gender, and a language; enters free-text keywords (for example, "brain cancer treatment"); and then opens a specific physician's profile. These inputs are encoded in plain text in the page URL and Referer and transmitted to Google (googleadservices.com and googleads.g.doubleclick.net), Microsoft's Bing (bat.bing.com), and X (analytics.twitter.com and t.co). The page title carrying the selected physician's name (for example, "Ali-Musa Jaffer | Moffitt") is sent in each platform's payload (Google tiba, Bing tl, X pt). Each request also carries that platform's persistent identifier—Google's auid, Microsoft's MUID cookie—and, on the same physician page, Reddit transmits a

PageVisit (esurl = the physician URL) carrying the same hashed email and telephone number observed in the appointment flow, tying the user's cancer-related browsing to the user's contact identity.

38. The figures below document these transmissions in sequence. The user's health-related search criteria and selected physician are transmitted in plain text to Google (Figures 6–8), to Microsoft's Bing (Figures 9–11), and to X (Figures 12–14)—both on the search-results page and again on the physician's profile page, where each platform additionally receives the specific physician's name. Finally, on the physician's page, Reddit re-attaches the same hashed email and telephone number observed in the appointment flow (Figure 15), tying the user's cancer-related browsing to the user's contact identity.




*Figure 6: The Find a Doctor search criteria transmitted in plain text to Google Ads: the url and ref parameters carry cancer-type = Brain+Cancer, gender = Male, and query = brain+cancer+treatment, with tiba = "Find a Doctor | Moffitt", the persistent auid = 178257048.1781101182, and hn = www.googleadservices.com.*



*Figure 7: The request headers for the Google transmission: :authority googleads.g.doubleclick.net, path /pagead/viewthroughconversion/…, and a Referer that reproduces the full brain-cancer search criteria.*



*Figure 8: On the physician's profile page, Google Ads receives tiba = "Ali-Musa Jaffer | Moffitt" together with the ref carrying the brain-cancer search criteria and the persistent auid.*




*Figure 9: The search criteria transmitted to Microsoft's Bing Universal Event Tracking tag (bat.bing.com): tl = "Find a Doctor | Moffitt" with the p and r parameters carrying cancer-type = Brain+Cancer, gender = Male, and query = brain+cancer+treatment, and evt = pageLoad.*




*Figure 10: The request headers for the Microsoft transmission: :authority bat.bing.com, the MUID cookie, and a Referer reproducing the brain-cancer search criteria.*




*Figure 11: On the physician's page, the Bing UET tag receives tl = "Ali-Musa Jaffer | Moffitt", identifying the specific neuro-oncology physician viewed.*




*Figure 12: The search transmitted to X (Twitter) as a conversion event: pt = "Find a Doctor | Moffitt" with tw_document_href carrying the brain-cancer criteria, integration = advertiser, p_id = Twitter.*




*Figure 13: The request headers for the X transmission: :authority t.co, path /i/adsct?… reproducing the criteria, with the Cookie header and Sec-Fetch-Site: cross-site.*




*Figure 14: On the physician's page, X receives pt = "Ali-Musa Jaffer | Moffitt" with tw_document_href set to the physician's URL.*




*Figure 15: On the physician's page, Reddit transmits a PageVisit with esurl = https://www.moffitt.org/providers/ali-musa-jaffer/ and the same hashed contact details from the appointment flow—auto_em = 9c63f5b4…26e92a50c and auto_pn—linking the user's brain-cancer-specialist browsing to the user's email and telephone number.*

39. Through these transmissions, the Third-Party Recipients learn the specific cancer type, provider type, and treatment keywords the user searched, and the specific physician the user viewed, keyed to persistent advertising identifiers and—through Reddit's re-attachment of the hashed email and telephone number—to the user's real-world contact identity.

**F. Users' Browsing Activity Across the Website**

40. The interception of users' electronic communications is not limited to the interactions described above. Every page URL a user visits on the Website—including pages describing cancer types, treatments, services, and physicians—is transmitted to the Third-Party Recipients in real time, together with their respective persistent identifiers. Through these transmissions, the Third-Party Recipients learn not only that the user visited the Website, but the specific cancer types, treatments, and physicians the user was researching.

41. This Complaint focuses on the Third-Party Recipients identified above because those are the tracking systems documented here. Network captures of the Website also show

requests to Meta Platforms, Inc.'s tracking endpoint (www.facebook.com/tr) under pixel identifier 2860657087453101, an Amazon advertising script, and call-tracking scripts. Discovery may reveal additional third-party recipients or additional tracking products deployed on the Website, including additional advertising products within the Google Marketing Platform, Microsoft's advertising network, and other programmatic-advertising platforms.

**G. Defendant's Responsibility for the Interception of Electronic Communications**

42. Although the Trackers perform the technical acquisition and transmission functions, Moffitt is legally responsible under the FSCA and ECPA because it intentionally procured, enabled, directed, authorized, or caused the Third-Party Recipients to acquire the challenged communications.

43. Moffitt knowingly made the affirmative decision to implement the Trackers on www.moffitt.org. This implementation was deliberate and required Defendant, or persons acting on its behalf, to configure and deploy the Trackers on the Website, including on the appointment-request and Find a Doctor functions. The captured requests show that Moffitt loads at least the Microsoft UET tags through a Google Tag Manager container and has configured the X pixel to report a click on the appointment form's "Next step" button. Without Moffitt's implementation and continued operation of this code, the Third-Party Recipients would not have received the electronic communications at issue.

44. Moffitt controls, participates in controlling, or has the contractual or practical ability to control which pages and events on its Website trigger tracking for Moffitt's advertising and analytics purposes, including whether the email-address and telephone-number matching features are enabled. At minimum, Moffitt could elect not to procure or use tracking on sensitive functions—including its appointment-request form, where the user's email and telephone number are collected, and its Find a Doctor search and physician pages, where cancer type, provider type,

keywords, and physician selections are disclosed—yet the captured requests show tracking operating on precisely those functions.

### H. Moffitt's Tracking Serves Its Own Commercial Purposes, Not Any Governmental Function

45. Moffitt's Internet Privacy Policy states that Moffitt uses "cookies and other data collection technology to collect and store your Personal information when you interact with the Services," and that the "Personal Information" it processes includes "[t]echnical information," defined to include a user's IP address, device ID, and "the webpages you visited on the Services." The Privacy Policy identifies two uses of that technical information, together with "demographics, behavior, and event tracking" collected through "[f]irst and third-party analytics cookies": to "[p]erform website analytics" and to "[d]eliver advertising" that is "relevant to your preferences and demographics." It also states that Moffitt uses this technology to generate web content "specifically designed for you," and it identifies Google Analytics as one such tool. The Trackers are advertising, conversion-measurement, and audience-building tools, and Moffitt placed them on the functions through which it acquires new patients.

46. Moffitt's Internet Privacy Policy addresses disclosures to government or law-enforcement authorities as a separate category—"As Required By Law"—made when Moffitt determines that disclosure is necessary to comply with applicable law, a request from law enforcement or a regulatory agency, or other legal process. Upon information and belief, no governmental entity or official requested, directed, or authorized Moffitt's deployment of the Trackers or its transmission of users' communications to the Third-Party Recipients, and Moffitt did not deploy the Trackers in connection with any governmental investigation or law-enforcement function. Moffitt deployed and configured the Trackers for its own advertising, analytics, and patient-acquisition purposes, and was not acting under color of law.

## I. Moffitt Is Not an Arm of the State

47. Section 1004.43 provides that Moffitt and any approved not-for-profit subsidiary "shall be conclusively deemed corporations primarily acting as instrumentalities of the state, pursuant to s. 768.28(2), for purposes of sovereign immunity." Fla. Stat. § 1004.43(1). That provision incorporates Florida's state-law tort immunity statute; it does not make Moffitt the State. The same statute provides that Moffitt and its subsidiaries are not "agencies" within the meaning of Fla. Stat. § 20.03(1). *Id.* § 1004.43(7). The Legislature chose a private corporate form for Moffitt, authorized it to form for-profit subsidiaries, and protects its managed-care contracts, marketing plans, and trade secrets as proprietary business information. *Id.* § 1004.43(1), (8).

48. Moffitt governs itself. Of the 21 directors on Moffitt's board, only two hold seats by statute: the President of the University of South Florida and the Chair of the Florida Board of Governors or a designee. The other 19 are elected by Moffitt's own board, which also selects its own chair. Fla. Stat. § 1004.43(1). Moffitt's Chief Executive Officer serves at the pleasure of the board and, subject to the board's approval, controls Moffitt's budget and all funds from private, local, state, and federal sources; controls and allocates practice income; appoints personnel and sets their compensation; and creates Moffitt's administrative structure. *Id.* § 1004.43(5). Moffitt's board also controls approximately $580.9 million in internally designated funds, which it may use at its discretion for other purposes. No state officer exercises day-to-day authority over Moffitt's operations, its Website, or its advertising.

49. Moffitt funds itself. According to Moffitt's audited consolidated financial statements for the fiscal year ended June 30, 2025, Moffitt reported approximately $3.017 billion in total revenues and other support. Patient service revenue was approximately $2.610 billion, about 86.5 percent of the total, while state appropriations were approximately $60.2 million, about 2.0 percent. Moffitt also received approximately $38.4 million from a dedicated share of state

cigarette-tax collections. Even counting both, direct state funding supplied only about 3.3 percent of Moffitt's revenue. Approximately 98 percent of Moffitt's functional expenses went to its own program services. Moffitt's patient service revenue comes overwhelmingly from managed-care payors (approximately 79 percent) and Medicare (approximately 20 percent); Medicaid, other payors, and self-pay patients together account for about 1 percent. In fiscal year 2025, Moffitt reported an excess of revenues and gains over expenses and losses of approximately $216.6 million and recorded approximately $1.6 million in income tax expense on its for-profit and unrelated-business activities. Moffitt's payments to the University of South Florida—approximately $25.5 million for utility services, parking, faculty salaries, and other support—are payments for services, not remittances of Moffitt's revenue to the University or the State.

50. Moffitt pays its own liabilities. At June 30, 2025, Moffitt reported approximately $3.836 billion in total assets, $2.205 billion in net assets, $524.0 million in cash and cash equivalents, and an unused $150 million commercial line of credit. Moffitt is the obligor on approximately $1.154 billion of long-term bonded debt, approximately $583 million of which is secured by Moffitt's own gross revenues, accounts receivable, and property. Moffitt purchases commercial insurance for tort, errors-and-omissions, and other risks, and carries claims-made commercial professional-liability coverage under which it is liable for specified retention amounts. Moffitt's own audited financial statements describe its sovereign immunity as statutory immunity under chapter 768 of the Florida Statutes, the State's tort-claims statute. In December 2023, Moffitt's subsidiaries H. Lee Moffitt Cancer Center and Research Institute Hospital, Inc. and Moffitt Medical Group resolved False Claims Act allegations by agreeing to pay $19,564,743, plus interest, from their own funds. Upon information and belief, no Moffitt entity participates in the

State Risk Management Trust Fund for claims of the kind asserted here, and any judgment in this action would be paid by Moffitt or its commercial insurers, not by the State Treasury.

51. For these reasons, Moffitt is not an arm of the State of Florida when it operates commercial advertising and analytics technologies on its patient-acquisition Website, and it is not entitled to Eleventh Amendment immunity from Plaintiffs' federal claim. Moffitt's status under Florida law as an instrumentality for purposes of Fla. Stat. § 768.28 does not bar or limit Plaintiffs' ECPA claim.

**J. Moffitt's Terms of Use and Privacy Policy Do Not Authorize the Tracking Conduct**

52. Moffitt's Website includes a link to an Internet Privacy Policy in the footer of the Website's pages. Users are not required to affirmatively agree to the Privacy Policy before requesting an appointment, running the Find a Doctor search, viewing a physician's profile, or otherwise interacting with the Website.

53. Far from authorizing the tracking conduct, Moffitt's Internet Privacy Policy represents the opposite. The Policy describes only in general terms that Moffitt uses cookies and other data-collection technologies and that it may receive information through social-media plug-ins, and it represents that Moffitt discloses Personal Information outside Moffitt only at the user's direction or as disclosed at the time of collection, to service providers that "process Personal Information solely on our behalf," in a corporate transaction, or as required by law, while reserving the right to disclose or sell to third parties only "non-identifiable aggregate or anonymized information." It further represents that the information collected by Google Analytics cookies "is aggregated." A reasonable user reading these representations would understand that his or her sensitive personal and health-related information is not being shared with third-party advertising companies in identifiable form—precisely the opposite of what Moffitt's tracking conduct accomplishes. The real-time transmission of the user's hashed email and telephone number and

the user's specific cancer-type, provider, keyword, and physician selections to multiple third-party advertising platforms cannot be reconciled with these representations. The Third-Party Recipients are not service providers processing information "solely on [Moffitt's] behalf"; they use what they receive for their own advertising businesses.

54. Even if enforceable, Moffitt's privacy disclosures do not operate as consent to Moffitt's use of the Trackers to intercept users' private health-related and personal information and transmit it to third-party advertising companies. Consent is limited to the specific conduct authorized, and a reasonable person would not understand a generic privacy policy—let alone one representing that Moffitt shares Personal Information only with service providers acting solely on its behalf and otherwise discloses only non-identifiable, aggregate, or anonymized information—to authorize the real-time interception and transmission of the user's appointment-request contact details, cancer-related search criteria, and physician selections to the Third-Party Recipients for advertising and analytics purposes. Moffitt's Terms and Conditions of Use likewise disclose nothing about the Trackers. They state that Moffitt "has taken reasonable steps to protect any information that you may submit from unauthorized interception and use," and warn only that "the risk of unauthorized interception" of information transmitted over the Internet "cannot be entirely eliminated." That language tells users that Moffitt is guarding their information against interception, not causing it.

55. Moffitt's privacy disclosures also cannot constitute consent because they are presented as a passive browsewrap arrangement. The Privacy Policy is accessible only through a small-print hyperlink in the Website footer, among numerous other links. Users are not required to take any affirmative action—such as clicking "I agree" or checking a box—before their data is collected and disclosed, and are deemed to "assent" merely by using the Website: Moffitt's Terms

and Conditions of Use declare that "BY ENTERING THIS WEBSITE, YOU AGREE TO THE TERMS." Browsewrap terms are enforceable only where the hyperlink to the terms is conspicuous enough to put a reasonably prudent person on inquiry notice before engaging with the website. Moffitt's footer link fails this test.

56. Moffitt's Terms and Conditions of Use, which state that use of the Website is also subject to the Internet Privacy Policy, contain no arbitration provision and no class-action waiver. They purport to bind users through the same passive browsewrap arrangement described above, and Plaintiffs and Class Members never saw, agreed to, or were asked to agree to them. None of their provisions—including their purported limitation of liability and their choice-of-forum and attorneys' fees provisions—binds Plaintiffs or Class Members, and nothing in them prevents the claims of the affected users from being pursued collectively in this Court.

**K. Moffitt's Conduct Violates HIPAA**

57. Moffitt holds itself out as a healthcare organization that owns and operates a cancer hospital, clinics, and a multi-specialty oncology physician practice; provides and coordinates medical care; and maintains information concerning patients' health conditions, care needs, and services sought. Moffitt publishes privacy materials on its Website reflecting that it recognizes obligations under HIPAA in connection with its role. Its Internet Privacy Policy acknowledges that contact information "may be considered Protected Health Information if we collect it in connection with the provision of health care items or services," and lists "Protected Health Information" among the categories of information Moffitt processes to "[s]chedule an appointment."

58. Moffitt is a covered entity under HIPAA within the meaning of 45 C.F.R. § 160.103. It is a health care provider that furnishes and bills for health care through its hospital, clinics, and physician practice. As a covered entity, Moffitt is subject to HIPAA's prohibitions on the unauthorized use and disclosure of PHI. *See* 45 C.F.R. § 164.502(a). Moffitt's Notice of

Privacy Practices acknowledges that Moffitt is "required by law to maintain the privacy of your protected health information." It identifies as protected health information "[i]nformation about health care products or services you have received or may receive" when combined with "[u]nique numbers that may identify you," including "your phone number." And it promises that, except in situations the notice describes, Moffitt "will need to obtain your written authorization before using or disclosing your protected health information for other purposes or for sharing it with others outside the Cancer Center," and that it "must obtain your written authorization . . . for the use or disclosure of your protected health information for marketing purposes." Moffitt's embedding of third-party tracking code that transmits PHI to the Third-Party Recipients is an unauthorized disclosure.

59. PHI is defined as "individually identifiable health information" that is transmitted or maintained in electronic or any other form or medium. 45 C.F.R. § 160.103. Individually identifiable health information ("IIHI") is health information that is (1) created or received by a health care provider, health plan, employer, or health care clearinghouse; (2) relates to an individual's past, present, or future physical or mental health or condition, or to the provision of or payment for health care; and (3) either identifies the individual or provides a reasonable basis to believe the individual can be identified. 45 C.F.R. § 160.103.

60. When users interact with the Website—requesting new-patient appointments, running the Find a Doctor search by cancer type and keywords, and opening the profiles of specific oncology physicians—they disclose information relating to the past, present, or future physical health or condition of themselves or the individuals for whom they seek care, and to the provision of health care. This information is collected by Moffitt in the context of users seeking cancer care and satisfies the first two prongs of the IIHI definition. Moffitt's own Terms and Conditions of

Use acknowledge that users submit "Personal Information" through the Website, including "information about your medical condition."

61. The identifiers transmitted alongside users' health-related interactions satisfy the third prong. HIPAA's de-identification provision treats a "unique identifying number, characteristic, or code"—including telephone numbers, email addresses, and device identifiers—as an identifier that must be removed for information to qualify for the regulatory safe harbor. 45 C.F.R. § 164.514(b)(2)(i). The user's hashed email and telephone number transmitted to Reddit and X, and the persistent Google auid and Microsoft MUID identifiers transmitted in the Find a Doctor flow, are precisely such identifiers. Because a SHA-256 hash of a telephone number can be reversed within seconds and a hashed email can be matched against records the recipients already hold, the transmitted values identify the individual or provide a reasonable basis to believe the individual can be identified. *See Kane v. Univ. of Rochester*, 2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024) (holding that the IIHI threshold can be satisfied where transmitted data, though seemingly scrambled, can be decoded by the recipient to identify the individual).

62. The health-related information intercepted from Moffitt's Website is highly sensitive. It reveals that the user is seeking cancer care, the specific cancer type and treatment the user is researching, and the specific oncology physician the user selected, linked to the user's email and telephone number. The disclosure of this information to advertising companies exposes users to privacy invasions and to the risk of stigma, discrimination, and targeted exploitation.

63. HIPAA criminalizes the knowing disclosure of individually identifiable health information in violation of HIPAA, with enhanced penalties where the offense is committed with intent to sell, transfer, or use the information for commercial advantage, personal gain, or malicious harm. 42 U.S.C. § 1320d-6. Moffitt did not deploy or procure the Trackers merely for

passive website maintenance. The Trackers were selected and used to obtain advertising, analytics, conversion-measurement, retargeting, audience-building, and lead-generation benefits by transmitting substantive cancer-care communications and contact identifiers to third parties. Those facts support the inference that a purpose of the challenged interception was to disclose and use individually identifiable health information for commercial advantage and that the alleged HIPAA offense was independent of the interception prohibited by the ECPA.

64. Upon information and belief, Moffitt has not executed HIPAA-compliant Business Associate Agreements with the Third-Party Recipients for the tracking activities described herein, and has not obtained the HIPAA-compliant authorizations necessary to permit such disclosures for non-treatment purposes. To the extent Moffitt contends that any Third-Party Recipient acted as its business associate, no agreement would authorize the recipients to receive and use the challenged information for their own advertising, profiling, retargeting, or other independent commercial purposes. Moffitt's Notice of Privacy Practices represents that Moffitt will share health information only "with business associates who have agreed to keep your information private and confidential." Upon information and belief, none of the Third-Party Recipients has agreed to keep the information at issue private and confidential; each uses it for its own advertising business.

65. Moffitt had actual and constructive knowledge that its deployment of third-party trackers on its Website violated HIPAA. In December 2022, and as updated in March 2024, the U.S. Department of Health and Human Services, Office for Civil Rights, issued guidance expressly warning HIPAA-covered entities and business associates that the use of third-party tracking technologies on websites—including pixels and analytics tools—that transmit PHI to third-party vendors without a valid Business Associate Agreement constitutes an unauthorized disclosure in violation of HIPAA. Moffitt, which publishes its own privacy materials and holds itself out as

handling health information subject to HIPAA, cannot credibly claim ignorance of this well-publicized federal guidance. Moffitt's continued deployment of the Trackers reflects a knowing and deliberate choice to prioritize advertising and analytics benefits over its legal obligations.

66. Moffitt's own Internet Privacy Policy acknowledges that Moffitt uses "behavior" and "event tracking" information collected through third-party cookies to "[d]eliver advertising" relevant to users' "preferences and demographics." Moffitt therefore knew that its Trackers transmitted individual-level information about users' activity, not merely aggregate statistics, and its representations that it shares Personal Information only with service providers acting solely on its behalf, and otherwise discloses only non-identifiable aggregate or anonymized information, were knowingly inaccurate.

## L. Plaintiffs' Specific Experiences

### i. Kathy K. Peoples

67. Plaintiff Kathy K. Peoples is a Florida resident and a cancer patient who suffers from neuroendocrine cancer. Beginning after she relocated to Florida in early 2024, and on more than one occasion over approximately the following two years, Ms. Peoples used the Website to research and locate care for her condition, including in 2025. Ms. Peoples accessed the Website from Florida using the Safari browser on her Apple iPad and Apple iPhone. She did not use ad blockers, "incognito" mode, or a virtual private network, meaning the Trackers embedded on the Website were fully operational during her visits.

68. Before interacting with the Website, Ms. Peoples was not presented with any cookie banner, pop-up, checkbox, clickwrap, or other affirmative request for permission to disclose her searches or her cancer-related browsing information to the Third-Party Recipients.

69. During her visits, Ms. Peoples used the Website's Find a Doctor function to search for a specific neuroendocrine-cancer specialist by name and to research the cancer types,

procedures, and treatments Moffitt offers for her condition, and she opened the profiles of specific physicians. In doing so, Ms. Peoples disclosed information concerning her cancer condition and care needs and the specific physicians and treatments she was seeking. In the same manner documented above in Figures 6 through 15, those search criteria and physician selections—encoded in the page URL—were intercepted in real time and transmitted to Google, Microsoft (Bing), X, and Reddit, together with persistent advertising identifiers, all without Ms. Peoples's knowledge or consent. At the time of her searches, Ms. Peoples was signed into her Google account, linking those communications to her authenticated Google identity.

**ii. Michael G. Moore**

70. Plaintiff Michael G. Moore is a Florida resident and a cancer patient who has received and continues to receive treatment at Moffitt. Beginning in September 2025, and on numerous occasions, Mr. Moore and members of his household used the Website in connection with his cancer care—requesting new-patient appointments, exchanging messages and communications, participating in video and Zoom visits, and researching the services and treatments Moffitt offers. Mr. Moore accessed the Website from Florida using a combination of the Google Chrome and Microsoft Edge browsers on a desktop and laptop computer, and the Safari and Google Chrome browsers on his iPhone. He did not use ad blockers, "incognito" mode, or a virtual private network, meaning the Trackers embedded on the Website were fully operational during his visits.

71. Before interacting with the Website, Mr. Moore was not presented with any cookie banner, pop-up, checkbox, clickwrap, or other affirmative request for permission to disclose his contact details or his cancer-related browsing information to the Third-Party Recipients.

72. In connection with obtaining care, Mr. Moore's email address and telephone number were submitted through Moffitt's "Request a New Patient Appointment" process. In the

same manner documented above in Figures 1 through 5, those contact details were transmitted to Reddit and X as SHA-256 hashes—functionally in the clear—without Mr. Moore's knowledge or consent, and identify him whether or not he holds an account with either platform.

73. Mr. Moore also used the Website's Find a Doctor function to search by cancer type and treatment protocol and to open the profiles of specific Moffitt physicians. In the same manner documented above in Figures 6 through 15, those search criteria and physician selections—encoded in the page URL—were intercepted in real time and transmitted to Google, Microsoft (Bing), X, and Reddit, together with persistent advertising identifiers and, on the physician pages, Mr. Moore's hashed email and telephone number. At the time of these searches, Mr. Moore was signed into his Google account, linking those communications to his authenticated Google identity.

74. Mr. Moore remains a Moffitt patient. He continues to use the Website to research Moffitt's services, locate physicians, and manage his care, and he will continue to do so while he receives treatment at Moffitt. So long as the Trackers remain on the Website, his communications through the Website will continue to be intercepted and disclosed to the Third-Party Recipients.

### M. The Interceptions Are Ongoing

75. Upon information and belief, the Trackers remained active on the appointment-request and Find a Doctor functions when this action was filed on August 20, 2026, and remain active today. Moffitt can disable, reconfigure, or restore the Trackers at any time through its accounts with the Third-Party Recipients and its tag-management container. Absent an injunction, nothing prevents Moffitt from continuing or resuming the conduct alleged here.

## INJURY TO PLAINTIFFS AND CLASS MEMBERS

76. Moffitt's procurement of the unauthorized interception of Website user communications has caused actual harm to Plaintiffs and Class Members in multiple ways.

77. **Invasion of Privacy.** The health-related and personal information disclosed through users' appointment-request contact details, cancer-type and treatment searches, and physician selections—including the fact that the user is seeking cancer care and the specific conditions, treatments, and providers the user researches for themselves or their loved ones—is among the most private information an individual possesses. Its interception and disclosure to advertising companies can result in significant embarrassment, stigma, and discrimination. Plaintiffs and Class Members have suffered an invasion of privacy through the unauthorized interception of their electronic communications and health-related disclosures, violating their reasonable expectation that their interactions with Moffitt would remain private.

78. **Commercial Exploitation and Loss of Control.** Moffitt caused Plaintiffs' and Class Members' sensitive communications to be disclosed to advertising and analytics recipients and used the resulting data flows to obtain advertising, measurement, audience, and lead-generation benefits. Plaintiffs and Class Members thereby lost control over information they had communicated for the limited purpose of seeking cancer information, care, and providers. In today's digital economy, personal data—especially health-related information—has significant commercial value, as demonstrated by Moffitt's own use of that data for advertising, analytics, and lead generation.

79. **Diminished Confidence in Healthcare Privacy.** The unauthorized interception of Plaintiffs' and Class Members' communications has undermined their ability to freely and confidentially seek medical information, research cancer care options, and arrange care for themselves and their loved ones without fear that their activities and disclosures are being intercepted by third parties.

80. **Risk of Further Use of Intercepted Data.** Once intercepted by the Third-Party Recipients, Plaintiffs' and Class Members' data is beyond their control and may be further processed, combined with other data, and used for advertising and profiling purposes. By receiving information revealing that a particular user sought cancer care or expressed interest in specific cancer types, treatments, or physicians, an advertising platform can associate that health-related interest with the user or the user's browsing profile and use it to deliver targeted advertising over time. The resulting harm is ongoing and concrete.

81. **Statutory Injury.** Independent of the above harms, Moffitt's violations of the FSCA and ECPA have caused Plaintiffs and Class Members to suffer statutory injury, entitling them to the remedies provided by law.

## CLASS ACTION ALLEGATIONS

82. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

83. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States who visited Moffitt's Website (www.moffitt.org) and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Moffitt within the applicable statute of limitations period (the "Nationwide Class").

84. The Florida Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in Florida who visited Moffitt's Website (www.moffitt.org) and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Moffitt within the applicable statute of limitations period (the "Florida Class").

85. Together, the Nationwide Class and the Florida Class are referred to as the "Class."

86. Excluded from the Class are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) the Third-Party Recipients

(Google, Microsoft, X, and Reddit), and their officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned, their immediate family members and staff, and the attorneys for the parties and their staff; and (e) any jurors assigned to this case.

87. Plaintiffs reserve the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

88. **Numerosity.** The Class is so numerous that joinder of all members is impracticable. Moffitt operates one of the largest cancer hospitals in the United States, and its Website receives hundreds of thousands of unique visitors each month. Based on Website-traffic data, the Website receives approximately 705,000 visits per month—on the order of 7.2 million U.S. visits per year—and the appointment-request and Find a Doctor functions are core, prominently promoted navigation features. The number of individuals whose communications were intercepted by the Trackers during the relevant period is estimated to be in the hundreds of thousands. The precise number and identities of Class Members are within Defendant's and the Third-Party Recipients' records.

89. **Ascertainability.** The Class is ascertainable because its members can be identified through objective criteria using records maintained by Defendant and third parties. Moffitt's web-server logs, appointment-request records, and the advertising and analytics account records of the Third-Party Recipients contain records of visitors whose electronic communications were intercepted by the Trackers during the applicable limitations period, including IP addresses, cookie and advertising identifiers, hashed contact identifiers, timestamps, and the specific pages, searches, and form interactions involved. In addition, Moffitt collects names, contact information, and

appointment details from users who submit the appointment-request form, providing objective, reliable means of identifying Class Members.

90. **Commonality and Predominance.** There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a) Whether Moffitt implemented the Trackers on its Website;

(b) Whether the Trackers intercepted Website users' electronic communications;

(c) Whether Moffitt procured, enabled, and aided and abetted the interception of Website users' electronic communications;

(d) Whether Moffitt obtained Website users' consent to procure the interception of their electronic communications;

(e) Whether Moffitt's conduct violated Fla. Stat. § 934.03;

(f) Whether Moffitt's conduct violated 18 U.S.C. § 2511;

(g) Whether Moffitt acted under color of law in procuring the interceptions;

(h) Whether Moffitt is an arm of the State of Florida for purposes of the Eleventh Amendment;

(i) Whether Plaintiffs and Class Members are entitled to damages and other monetary relief, and if so, in what amount; and

(j) Whether Plaintiffs and Class Members are entitled to equitable relief, including declaratory and injunctive relief.

91. These common questions predominate over any individualized issues because Plaintiffs' claims challenge Moffitt's uniform, centralized conduct—the deployment of the same tracking code across its Website, including its appointment-request and Find a Doctor functions—rather than any individualized interaction between Moffitt and a particular Class Member. The Trackers operated in the same manner on every visitor's session, intercepting the same categories of data and transmitting that data to the same third parties using the same identifiers. Liability can therefore be established on a class-wide basis through common technical and documentary proof,

including Moffitt's Website source code, its arrangements with the Third-Party Recipients, and the technical operation of the Trackers. Whether Moffitt acted under color of law and whether it is an arm of the State likewise turn entirely on Moffitt's own structure, finances, and conduct, and will be answered the same way for every Class Member.

92. Any individualized questions—such as the specific pages a given Class Member visited or the precise dates of their visits—do not predominate. Courts routinely hold that predominance is satisfied in healthcare website tracking cases because the core liability inquiry focuses on the defendant's uniform deployment of tracking technology without consent, not on the content of any individual user's browsing session.

93. **Typicality.** Plaintiffs' claims are typical of the claims of the other Class Members. Plaintiffs and Class Members all visited Moffitt's Website and had their electronic communications intercepted by the Third-Party Recipients without their consent, arising from the same practices and course of conduct and based on the same legal theories.

94. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests adverse or antagonistic to those of the Class, and have retained counsel experienced in complex class action litigation, including class actions involving privacy violations, unlawful data collection, and the interception of electronic communications in the healthcare context. Plaintiffs' counsel have the resources, expertise, and commitment to prosecute this action vigorously through discovery, class certification, trial, and any appeals.

95. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members to individually redress the wrongs done to them. Prosecution of separate actions

would create a risk of inconsistent or varying adjudications. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

96. **Injunctive and Declaratory Relief.** Moffitt has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole under Rule 23(b)(2).

97. **Issue Certification.** Alternatively, Plaintiffs seek certification of the common issues identified above under Rule 23(c)(4). Certification of those issues would materially advance the litigation, promote uniform adjudication of Defendant's common conduct, and narrow any individualized questions that may remain after the class-wide issues are resolved.

## CAUSES OF ACTION

### COUNT I
### Violation of the Florida Security of Communications Act
### (Fla. Stat. §§ 934.03 and 934.10)
### (On Behalf of Plaintiffs and the Florida Class, for Declaratory and Injunctive Relief)

98. Plaintiffs incorporate paragraphs 1–97 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Class.

99. The FSCA prohibits intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any electronic communication. Fla. Stat. § 934.03(1)(a). The FSCA is an all-party consent statute, requiring the consent of all parties to the communication. Fla. Stat. § 934.03(2)(d).

100. The FSCA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3). It defines "contents" as "any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7). The FSCA was "designed to

protect precisely the information at issue in this case—private medical information." *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *4 (M.D. Fla. Mar. 6, 2025).

101. The Trackers deployed on Moffitt's Website constitute "electronic, mechanical, or other device[s]" within the meaning of the FSCA. Unlike session-replay technology that merely records mouse movements, the Trackers here actively intercept and transmit the contents of users' communications, including the user's appointment-request contact details and the user's cancer-type, provider, keyword, and physician selections.

102. The transmissions between Plaintiffs and Class Members and Moffitt's Website constitute "electronic communications" within the meaning of the FSCA because they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system. Fla. Stat. § 934.02(12).

103. The Trackers intercept the "contents" of Plaintiffs' and Class Members' electronic communications, not merely routing or addressing information. The user's hashed email and telephone number, cancer-type and keyword search criteria, and physician selections transmitted to the Third-Party Recipients plainly concern the "substance, purport, or meaning" of the user's communication within the meaning of Fla. Stat. § 934.02(7). Likewise, the URLs of the search-results and physician pages a user visits—and the plain-text search criteria embedded in those URLs—encode the specific cancer types, treatments, and physicians being researched and therefore constitute "contents" rather than mere routing information. *See W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at 4–5 (holding that URLs reflecting medical services sought constitute "contents" under the FSCA); *Goldstein v. Costco Wholesale Corp.*, 559 F. Supp. 3d 1318, 1321 (S.D. Fla. 2021) (URLs may constitute "contents" where they reveal substantive information about

a user's activity). Moffitt's conduct is readily distinguishable from the collection of "basic analytic data" in a "generic commercial setting" at issue in *Jacome v. Spirit Airlines, Inc.*, 2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021), because the data intercepted here is confidential, health-related information the FSCA was enacted to protect.

104. Moffitt intentionally procured the Third-Party Recipients to intercept these electronic communications by deliberately implementing the Trackers on its Website. Plaintiffs and Class Members did not consent to this interception.

105. The FSCA authorizes any person whose communication is intercepted in violation of the statute to obtain "[p]reliminary or equitable or declaratory relief as may be appropriate." Fla. Stat. § 934.10(1)(a). On this Count, Plaintiffs seek only that relief: a declaration that Moffitt's procurement of the interceptions violates the FSCA, and an injunction prohibiting Moffitt from continuing to deploy the Trackers to intercept Florida Class Members' electronic communications without proper consent. Plaintiffs do not seek damages on this Count.

106. *South Broward Hospital District v. Kaplan*, 393 So. 3d 743 (Fla. 4th DCA 2024), addressed whether the FSCA waives sovereign immunity for damages. It did not address a claim limited to declaratory and injunctive relief. Plaintiffs preserve their position that *Kaplan* does not bar this Count and, to the extent it is read to do so, that it was wrongly decided.

107. Moffitt's violations are continuing. Plaintiff Moore and Florida Class Members who continue to use the Website face ongoing interception of their communications and have no adequate remedy at law for these continuing violations.

**COUNT II**
**Violation of the Electronic Communications Privacy Act**
**(18 U.S.C. §§ 2511 and 2520)**
**(On Behalf of Plaintiffs and the Nationwide Class)**

108. Plaintiffs incorporate paragraphs 1–97 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

109. The ECPA prohibits the intentional interception of electronic communications and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

110. The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2520(a). Moffitt, a corporation, is a "person" and an "entity" subject to suit under that provision. 18 U.S.C. §§ 2510(6), 2520(a).

111. The transmissions between Plaintiffs and Class Members and Moffitt's Website are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce, and therefore constitute "electronic communications" within the meaning of the ECPA. 18 U.S.C. § 2510(12).

112. The Trackers intercepted the "contents" of Plaintiffs' and Class Members' electronic communications within the meaning of the ECPA, for the same reasons set forth above with respect to the FSCA.

113. Although the ECPA contains a one-party consent exception, 18 U.S.C. § 2511(2)(d), that exception does not apply where a communication is intercepted for the purpose of committing a criminal or tortious act in violation of federal or state law. Moffitt procured these interceptions at least in part for the purpose of disclosing and using users' individually identifiable health information through third-party advertising and analytics systems to obtain commercial

advantages, including conversion measurement, retargeting, audience building, lead generation, and new-patient enrollments. That disclosure and use of individually identifiable health information—separate from the act of interception itself—violated HIPAA's criminal prohibition where undertaken knowingly and with intent to transfer or use the information for commercial advantage. 42 U.S.C. § 1320d-6. The captured transmission of hashed contact identifiers and plain-text cancer-care searches with persistent identifiers, the placement of advertising technologies on functions soliciting those communications, Moffitt's privacy representations, and its continued receipt of marketing and enrollment benefits support the inference of that unlawful purpose. Whether Moffitt possessed that purpose and the requisite knowledge is a fact-intensive issue that should be resolved on a complete evidentiary record. *See Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025)*; W.W. v. Orlando Health, Inc*., 2025 WL 722892, at *6–7 (M.D. Fla. Mar. 6, 2025); *Kurowski v. Rush Sys. for Health*, 2023 WL 2349606 (N.D. Ill. Mar. 3, 2023).

114. Moffitt's knowing violation of HIPAA is supported by, among other things, its own publication of privacy materials, its acknowledgment that it uses behavior and event-tracking information collected through third-party cookies to deliver advertising, and its awareness of the HHS Office for Civil Rights guidance warning that tracking technologies on healthcare websites that transmit PHI without a valid Business Associate Agreement violate HIPAA.

115. That Moffitt may have been motivated by commercial purposes does not preclude application of the crime-tort exception. *See Stein*, 2025 WL 580556, at *6 ("The language of the statute gives no hint that conduct falls outside the reach of the statute if a person acted based on financial motivations.").

116. Moffitt intentionally procured the Third-Party Recipients to intercept these electronic communications by deliberately implementing the Trackers on its Website, within the meaning of 18 U.S.C. § 2511(1)(a). Users did not consent to Moffitt's procurement of third-party interception or to the sharing of their appointment-request contact details, cancer-related search criteria, physician selections, and associated identifiers for advertising, analytics, retargeting, or conversion-optimization purposes.

117. Moffitt was not acting under color of law when procuring these interceptions, and 18 U.S.C. § 2511(2)(c) does not apply. As alleged in Section H, no governmental entity or official directed or authorized the tracking, and Moffitt deployed the Trackers for its own commercial advertising, analytics, and patient-acquisition purposes, not in service of any governmental investigative or law-enforcement function. No other exception to ECPA liability applies.

118. Florida's sovereign-immunity statutes, including Fla. Stat. §§ 768.28 and 1004.43, do not bar or limit this federal claim. A State has no power to confer immunity from a federal cause of action, and a State's damages caps, notice requirements, and other conditions on state-law tort suits do not apply to federal claims. *Doe v. Dynamic Physical Therapy, LLC*, 607 U.S. 11 (2025) (per curiam); *Howlett*, 496 U.S. 356; *Felder*, 487 U.S. 131.

119. Moffitt is not an arm of the State and is not entitled to Eleventh Amendment immunity, for the reasons alleged in Section I. State law defines Moffitt as a private nonprofit corporation that is not a state agency; Moffitt is controlled by its own self-perpetuating board and its Chief Executive Officer; it derives more than 96 percent of its revenue from sources other than state appropriations and dedicated state tax revenue; and any judgment would be paid by Moffitt or its commercial insurers rather than the State Treasury. The particular function at issue—

operating commercial advertising and analytics technologies on a patient-acquisition website—is not a function of the State.

120. As a direct result of Moffitt's violations, Plaintiffs and Class Members are entitled under 18 U.S.C. § 2520(b) and (c)(2) to: (a) the greater of (i) the sum of their actual damages and any profits Moffitt made as a result of the violations, or (ii) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000; (b) punitive damages; (c) preliminary and other equitable or declaratory relief; and (d) reasonable attorneys' fees and other litigation costs reasonably incurred.

121. Moffitt's profits from its violations include the revenue it obtained from new patients whose appointments and referrals were generated, measured, or attributed through advertising that the intercepted communications made possible.

122. Moffitt's violations were willful. Moffitt configured the Trackers to collect and transmit users' contact information and cancer-related searches after federal regulators had warned covered entities against precisely such practices, while representing to users that it shared only non-identifiable, aggregate, or anonymized data. Punitive damages are warranted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all other Class Members similarly situated, respectfully request that this Court:

(a) Certify this case as a class action on behalf of the proposed Class, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

(b) Declare that Moffitt's actions, as described herein, violate the FSCA and the ECPA;

(c) On Count II, award Plaintiffs and the Nationwide Class the greater of their actual damages plus Moffitt's profits from its violations, or statutory damages, as provided by 18 U.S.C. § 2520(c)(2);

(d) On Count II, award Plaintiffs and the Nationwide Class punitive damages;

(e) Award injunctive relief requiring Moffitt to cease procuring the interception of Website users' communications without proper consent; to disable or segregate the Trackers from its appointment-request, Find a Doctor, physician-profile, and other health-related functions unless valid consent and authorization are obtained; to disable any feature that collects or transmits users' email addresses or telephone numbers to the Third-Party Recipients; to request deletion of improperly transmitted data from the Third-Party Recipients to the extent within Moffitt's control or contractual rights; and to implement appropriate safeguards to protect Website users' privacy in the future;

(f) On Count II, award Plaintiffs and the Nationwide Class pre-judgment and post-judgment interest;

(g) Award Plaintiffs and the Class reasonable attorneys' fees and costs, as allowed by law, including under Fla. Stat. § 934.10(1)(d) and 18 U.S.C. § 2520(b)(3); and

(h) Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: October 13, 2026

Respectfully submitted,

*By: /s/ Adam A. Schwartzbaum*
Adam A. Schwartzbaum, Esq.
**LEAD COUNSEL**
Florida Bar No. 93014
**SCHWARTZBAUM**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Telephone: 786-453-8485
Primary Email: adam@schwartzbaum.com
Secondary Email: admin@schwartzbaum.com

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I certify that on October 13, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

*/s/ Adam A. Schwartzbaum*
Adam A. Schwartzbaum